## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARI CARTAGENOVA, KEVIN MANSFIELD, and ABBY MUSICK on behalf of themselves and all others similarly situated, | Civil Action No. |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| v. | |
| DOTDASH MEREDITH, INC. | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

Plaintiffs Mari Cartagenova, Kevin Mansfield, and Abby Musick, individually and on behalf of all other persons similarly situated, by and through Plaintiffs' attorneys, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, which are based on personal knowledge.

### I.    NATURE OF THE ACTION

1.    This is a consumer digital privacy class action complaint brought on behalf of all persons with Facebook accounts who have subscribed to newsletters from Entertainment Weekly and People, and interacted with videos on their respective websites (ew.com and people.com, collectively the "Websites"). The Websites are owned and operated by Defendant Dotdash Meredith, Inc. ("Defendant" or "Dotdash Meredith").

2.    The federal Video Protection Privacy Act ("VPPA") protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly

discloses, to any person, personally identifiable information concerning any consumer of such provider", without express consent. 18 U.S.C. § 2710.

3.      Every time a person interacts with a video on the Websites (including by clicking play, pausing the video, adjusting the volume in the video player, or moving the video into fullscreen mode) while logged into Facebook, Dotdash Meredith breaches the VPPA. Dotdash Meredith knowingly and without proper consent discloses to third party, Meta Platforms, Inc. ("Facebook"), users': (i) personally identifiable information including their Facebook ID numbers ("FID"), and (ii) a computer file containing the title of the video along with its corresponding URL, constituting a record of each video clip they viewed on the Website (collectively, "Personal Viewing Information").

4.      The VPPA provides consumers whose privacy has been breached with the right to recover statutory damages of $2,500 per violation, plus attorney's fees and costs. Plaintiffs bring this claim to achieve redress on behalf of themselves and others whose privacy rights were similarly violated by Dotdash Meredith's unlawful conduct.

## II.      PARTIES

5.      Plaintiff Mari Cartagenova is an individual who at all relevant times has resided and been domiciled in Westford, Massachusetts.

6.      Plaintiff Kevin Mansfield is an individual who at all relevant times has resided and been domiciled in Westerly, Rhode Island.

7.      Plaintiff Abby Musick is an individual who at all relevant times has resided and been domiciled in Alexander City, Alabama.

8.      Defendant is incorporated under the laws of Delaware and maintains its corporate headquarters at 225 Liberty Street, New York, New York 10281. Defendant owns and operates

the Websites at issue in this litigation, "people.com" and "ew.com," among others. Dotdash Meredith is a wholly-owned subsidiary of IAC, Inc. ("IAC"), a publicly-held media conglomerate.

### III.   JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because it is a civil action arising under a law of the United States: the VPPA,18 U.S.C. § 2710, *et seq*.

10.     This Court also has jurisdiction under the Class Action Fairness Act because there is diversity in citizenship between the parties, there are 100 or more class members, and the amount in controversy for the proposed Class (defined below) exceeds $5,000,000, excluding interest and costs. 28 U.S.C. § 1332(d).

11.     Venue is proper in this District because a substantial part of the events giving rise to the claim occurred in this District. Specifically, as described herein, Defendant has directed its newsletters to Plaintiff Cartagenova and other Class Members in this District, and in so doing has surreptitiously transmitted Plaintiff Cartagenova's Personal Viewing Information to a third party as described herein.

12.     Defendant is subject to this Court's personal jurisdiction because it directly sends its newsletters to IP addresses associated with physical addresses in the State of Massachusetts, including those of Plaintiff Cartagenova and other Class Members who reside in the State of Massachusetts, directly giving rise to the claims alleged herein. On information and belief, Defendant also regularly conducts other business in the State of Massachusetts, including advertising its newsletters and website videos to residents of this State.

## IV.    COMMON FACTUAL ALLEGATIONS

### A.    Background to the Video Protection Privacy Act

13.    The VPPA was enacted in 1988 with the specific goal of safeguarding the privacy of personal and familial video rental, purchase, and viewing information. During the law's passage, Senator Paul Simon observed that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes and dislikes." S. Rep. No. 100-599 at 7-8 (1988). Senator Patrick Leahy, who introduced the legislation, commented that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id* at 8.

14.    Senator Leahy further stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988). Senator Leahy underscored that the deeply personal and biographical nature of the videos one watches, and the need to protect this information from disclosure, was the inspiration of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

15.    The principles of the VPPA remain profoundly relevant in today's digital age. When the Senate Judiciary Committee met in 2014 to consider the legislation in light of technological changes, Senator Leahy emphasized that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud', mobile apps, and other new technologies

4

have revolutionized the availability of Americans' information." *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 110th Cong. (2012) (Statement of Sen. Patrick Leahy).

**B.    Background to Defendant and the Websites**

16.    Dotdash Meredith is America's largest digital and print publisher, operating across multiple platforms–including print, digital, video, and social media–and reaching almost 200 million consumers every month through its portfolio of brands, including People, Entertainment Weekly, People en Español, Better Homes & Gardens, Verywell, Food & Wine, and Allrecipes.

17.    Dotdash Meredith was formed in 2021, following IAC, Inc.'s acquisition of the traditional media corporation Meredith Holdings Corporation ("Meredith") and the merger of Meredith with digital publisher Dotdash Media, Inc. Prior to the merger with Dotdash, the People and Entertainment Weekly brands, as well as the Websites, were owned and operated by Meredith.

18.    First launched as a weekly print magazine in 1974, People specializes in celebrity news and human interest stories. The brand reaches more than 130 million people every year across its platforms. Its website, people.com, is one of the most visited news websites in the United States.

19.    The print magazine Entertainment Weekly debuted in 1990, focusing on entertainment media news and critical reviews. Since 2022, the brand has been published only in a digital format on the website "ew.com."

20.    Video content has long been vital to these brands' digital strategy. In 2019 (prior to the merger with Dotdash), Meredith's CEO emphasized that video was a key focus, stating the

company would "invest in new digital platforms, more robust video production and other activities that will drive increased consumer engagement."[1]

21.    More recently, in 2024, Dotdash Meredith's parent company IAC emphasized the importance of video to its marketing strategy across its portfolio of companies and brands (including Dotdash Meredith): "... to continue to reach consumers and users, we will need to continue to identify and devote more of our overall marketing expenditures to newer digital advertising channels (such as online video, social media, streaming, OTT and other digital platforms), as well as target consumers and users via these channels in a cost-effective manner."[2]

22.    Consistent with this video-focused strategy, Dotdash Meredith's People and Entertainment Weekly brands deliver substantial video content to their users. Dotdash Meredith creates, hosts and delivers thousands of videos across the Websites relating to topics such as celebrity interviews, entertainment news segments, behind-the-scenes footage, and other original video programming. The videos are embedded alongside text articles, and the videos autoplay when users visit webpages and articles on the Websites. The scale of video delivery on the Websites is massive: as of January 2025, Entertainment Weekly reported 31 million monthly video views,[3] and People reported 453 million video views.[4]

23.    On the Websites, users can subscribe to various digital newsletters to receive the latest news and stories relating to topics addressed on each website. For example, on people.com, users can subscribe to any or allthe following newsletters: "People News," "Royals," "True

---

[1] 2019 Quarter 4 Meredith Earnings Call Transcript.

[2] IAC February 2024 Form 10K at 19.

[3] https://www.dotdashmeredith.com/brands/entertainment/entertainment-weekly (accessed January 27, 2025).

[4] https://www.dotdashmeredith.com/brands/entertainment/people (accessed January 27, 2025).

Crime," "People Shopping" and "People StyleWatch." Similarly, ew.com users can sign up for newsletters including "EW Dispatch," "Entertainment Weekly," and "People News." Each newsletter is sent directly to the user's inbox and contains links to various articles on the respective Website. Many of the linked articles feature video content that autoplays when the page loads.

24.     For both Websites, subscribing to any of these newsletters requires the user to provide their personal information to Dotdash Meredith, including their email address. All newsletter subscribers also provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and general physical location. Further, when users subscribe to newsletters, Dotdash Meredith discloses this subscription to Facebook, along with the user's personally identifiable FID (if the user is logged into Facebook on their browser).

25.     At no point during the newsletter sign-up process, or otherwise, did Defendant disclose to subscribers that it would share their Personal Viewing Information and FID with Facebook. Defendant did not obtain written consent from newsletter subscribers to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," which is a requirement under the VPPA.

**C.    How Defendant Disclosed Subscribers' Personal Viewing Information to Facebook**

*(i)      Facebook and the FID*

26.     Facebook is a social media platform with over 2.9 billion active monthly users. When users sign up on the platform, Facebook's Community Standards require its users to use their real identities, including first and last name. Users are only allowed one account, must use the name they use in "everyday life," and must also provide their birthday and gender.

27.     When a user signs up to Facebook, Facebook assigns them a unique FID number. The FID allows any ordinary person to identify a Facebook user with ease. For example, if the term "Facebook" and a user's FID is entered into a Google search, the person's Facebook profile will appear in the results. Alternatively, a user's profile can be reached by typing "facebook.com/" into the address bar of any browser and appending the FID at the end.

28.     When a user logs into Facebook through a web browser, Facebook places several cookies on the user's device. These cookies are small pieces of code that store information and help identify the user and the websites they visit. One important cookie Facebook uses is the "c_user" cookie, which contains the user's unique FID number. This cookie remains on the user's browser for up to a year after their last visit to Facebook unless they manually log out.

29.     Facebook intentionally designs the c_user cookie to have a long lifespan, allowing the company to track user activity across the web on the same browser, even if the user does not visit Facebook.com again. By using the FID, which is specific to an individual, Facebook can match user activity across different devices and browsers, creating a comprehensive user profile that includes information about the websites the user visited on each device.

30.     This tracking of user movements across the web and devices, enabled by the FID, allows Facebook to collect vast amounts of data on user interests, behavior, and connections. The extensive data collected enables Facebook to generate substantial advertising revenue by offering businesses the ability to target users with specific interests, retarget ads to users who visited their site without making a purchase, and analyze the types of Facebook users visiting their site by leveraging user demographics, interests, and behaviors on other websites.

*(ii)*      *The Facebook "Pixel"*

31.    To access these services provided by Facebook, businesses like Dotdash Meredith install the Facebook "pixel" on their websites. Also known as "web beacons," pixels are small, *invisible* images that a browser downloads like any other image on a website. The Facebooks pixel facilitates Facebook's tracking and data collection process, allowing Facebook to gather information about user behavior on the business's website and connect it to the user's Facebook profile using the c_user cookie and FID.

32.    When a user visits a web page containing the Facebook pixel, the pixel contacts the Facebook ad server. The pixel can be programmed by the business to send information to Facebook when users perform specific actions on the website, such as adding an item to their shopping cart, clicking a particular button, or watching a video. If the user has an active c_user cookie on their browser, Facebook receives the event information along with the user's FID, effectively linking the user's specific actions on the website to their Facebook profile. Without the pixel installed, the user's actions on the website would not be communicated to Facebook.

*(iii)    Defendant Used the Facebook Pixel to Send Digital Subscriber's Personal Viewing Information to Facebook*

33.    On an unknown date, but at least before April 2022, Dotdash Meredith installed Facebook pixel on the Websites and their individual pages.

34.    Defendant configured the pixel on the Website to send specific data to Facebook when a user who is viewing a video interacts with the video by clicking on it, such as to pause the video, play the video, adjust the volume, or adjust the size of the video player. This data shared with Facebook includes the title of the video, the page's URL and the user's FID (i.e., the Personal Viewing Information). The transmitted data permits Facebook to identify the specific videos that a specific individual has watched.

35.     The image below (also included in a larger size at Appendix 1 to this complaint) shows some of the information that is transmitted to Facebook when a video is paused. As seen in the image, the title of the article shared is "See Miley Cyrus' Many Outfit Changes as She Teases She 'Forgot' Her Underwear in Final Dress." The transmission of the article's URL to Facebook is shown in the right-hand page of the image below as: "https://people.com/2024-grammys-miley-cyrus-4-outfit-changes-style-photos-8558647". The title of the video transmitted to Facebook is also shown in the right-hand pane (highlighted), and reads "'title': 'Miley Cyrus Nails 5 Outfit Changes at 2024 Grammys | Photos.'" This title is distinct from both the page's URL and the title of the article. Two entries above the title, it can be seen that the transmission to Facebook included that the video was paused. The Facebook user's FID is also transmitted alongside this information.



36.     The data Defendant shared with Facebook was not anonymized or de-identified. Instead, it was linked to unique identifiers that tracked specific Facebook users, including Plaintiffs and Class Members. Crucially, Facebook received the Personal Viewing Information together (including the FID), allowing Facebook to directly connect the user with their viewing

activity. In this way, Dotdash Meredith's disclosures of Personal Viewing Information to Facebook allows Facebook to develop, supplement, or cross-reference existing data on its own detailed profiles about its users, including Plaintiffs and Class Members.

37.     Throughout the Relevant Period, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evident from various factors, including the pixel's functionality, which allowed Dotdash Meredith to display targeted advertising to newsletter subscribers on the Websites based on the videos they had previously viewed. Dotdash Meredith received financial compensation for this targeted advertising, demonstrating its knowledge of the pixel's data-sharing capabilities.

38.     Due to Dotdash Meredith's data compilation and sharing practices, Facebook acquired the Personal Viewing Information of subscribers to newsletters on the people.com and ew.com Websites, including Plaintiffs and Class Members, along with other sensitive personal information.

39.     Defendant did not obtain prior written consent from its digital subscribers before disclosing their Personal Viewing Information to Facebook. As a result, Dotdash Meredith's newsletter subscribers, including Plaintiffs and Class Members, remained unaware that their Personal Viewing Information and other sensitive data was being shared with Facebook.

40.     By disclosing its subscribers' Personal Viewing Information to Facebook, Dotdash Meredith has intentionally and knowingly violated the VPPA.

**D.      Defendant has no justification for sharing user's Personal Viewing Information with Facebook**

*(i)      Disclosing Personal Viewing Information is not necessary*

41.     Defendant does not need to use tracking pixels to operate the Websites and manage newsletter subscriptions. The Facebook pixel is used on the Website for the sole purpose of enriching Defendant and Facebook.

42.     Nor is Defendant obligated to disclose Personal Viewing Information to Facebook. In fact, Facebook itself seeks to prohibit the disclosure of such information without first complying with the specific requirements of the VPPA and relevant state laws. Therefore, Dotdash Meredith's disclosure of Personal Viewing Information to Facebook is not only unnecessary but prohibited by Facebook's own policies.

*(ii)*     *The Website's privacy policy did not disclose sharing of Personal Viewing Information and Defendant does not obtain informed consent from subscribers*

43.     Under the VPPA, lawful disclosure of a subscriber's or consumer's Personal Viewing Information to a third party requires a Video Tape Service Provider to obtain "informed, written consent" from that individual "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B). Defendant did not obtain consent from Plaintiffs and Class Members before sending their Personal Viewing Information to Facebook.

44.     Dotdash Meredith does state in a privacy policy that is linked on the Websites (effective July 24, 2024) that it, and its third-party partners automatically collect information about its Websites' users, including analytics or usage data relating to "pages visited, links clicked, videos watched." In the policy, Defendant also states that it and third-party partners might use information for advertising purposes, and that they  may collect data from pixels and cookies, and share that data for advertising purposes.

45.     Critically, however, the Defendant's privacy policy on the Websites does not disclose that the Dotdash Meredith shares newsletter subscribers' private, protected and personally identifiable Personal Viewing Information with third parties, including Facebook. The disclosures in Defendant's privacy policy do not meet the statutory requirements established in the VPPA.

46.     In any case, Defendant does not actively bring this privacy policy to users' notice when they use the Websites or subscribe to a newsletter. To access or read the privacy policy, users are required to scroll to the very bottom of a page on the Websites, or to the very bottom of a newsletter, first to find and hen click on a link written in small text saying "Privacy Policy." Accordingly, newsletter subscribers to the Websites do not manifest consent to the data collection and data sharing practices outlined in Defendant's Privacy Policy.

### V.     PLAINTIFFS' PERSONAL ALLEGATIONS

47.     Plaintiff Cartagenova has been a subscriber to an ew.com newsletter since 2024.

48.     When subscribing to an ew.com newsletter, Plaintiff Cartagenova provided Defendant with, among other information, her email address and IP address (which informs Defendant as to the city and zip code she resides in as well as her general, physical location). Defendant also disclosed Plaintiffs' subscription to the newsletter to Facebook, using the Facebook pixel as described above.

49.     Pursuant to her subscription to the ew.com newsletter, Defendant has sent its newsletters to Plaintiff Cartagenova, which she regularly receives at her residence. Plaintiff Cartagenova has periodically watched videos on ew.com, including the eighteen months before this Complaint.

50.    Plaintiff Cartagenova has had a Facebook account the entire time she has been a subscriber to ew.com newsletters.  Plaintiff Cartagenova has been logged into her Facebook account on the same browser that she uses to access the ew.com website, including when she has watched videos on the ew.com website.

51.    Plaintiff Cartagenova has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Facebook. Plaintiff Cartagenova has never received any written notice that Defendant discloses its digital subscribers' Personal Viewing Information to third parties, or any means of opting out of such disclosures of her Personal Viewing Information. Defendant nonetheless disclosed Plaintiff Cartagenova's Personal Viewing Information to Facebook.

52.    Plaintiff Mansfield has been a subscriber to an ew.com newsletter since 2022.

53.    When subscribing to an ew.com newsletter, Plaintiff Mansfield provided Defendant with, among other information, his email address and IP address (which informs Defendant as to the city and zip code she resides in as well as her general, physical location). Defendant also disclosed Plaintiffs' subscription to the newsletter to Facebook, using the Facebook pixel as described above.

54.    Pursuant to his subscription to the ew.com newsletter, Defendant has sent its newsletters to Plaintiff Mansfield, which he regularly receives at his residence. Plaintiff Mansfield has periodically watched videos on ew.com, including the eighteen months before this Complaint.

55.    Plaintiff Mansfield has had a Facebook account the entire time he has been a subscriber to ew.com newsletters.  Plaintiff Mansfield has been logged into his Facebook account on the same browser that he uses to access the ew.com website, including when he has watched videos on the ew.com website.

14

56.     Plaintiff Mansfield has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Mansfield has never received any written notice that Defendant discloses its digital subscribers' Personal Viewing Information to third parties, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless disclosed Plaintiff Mansfield's Personal Viewing Information to Facebook.

57.     Plaintiff Abby Musick has been a subscriber to a people.com newsletter and to People Magazine, and she regularly views videos on the people.com website.

58.     When subscribing to the people.com newsletter, Plaintiff Musick provided Defendant with, among other information, her email address and IP address (which informs Defendant as to the city and zip code she resides in as well as her general, physical location). Defendant also disclosed Plaintiffs' subscription to the newsletter to Facebook, using the Facebook pixel as described above.

59.     Pursuant to her subscription to the people.com newsletter, Defendant has sent its newsletters to Plaintiff Musick, which she regularly receives at her residence. Plaintiff Musick has periodically watched videos on people.com, including in the eighteen months prior to the filing of this Complaint.

60.     Plaintiff Musick has had a Facebook account the entire time she subscribed to People Magazine and the people.com newsletter.  Plaintiff Musick has been logged into her Facebook account on the same browser that she uses to access the people.com website and newsletters, including when she has watched videos on the people.com website.

Plaintiff Musick has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Facebook. Plaintiff Musick has never received any

written notice that Defendant discloses its digital subscribers' Personal Viewing Information to third parties, or any means of opting out of such disclosures of her Personal Viewing Information. Defendant nonetheless disclosed Plaintiff's Personal Viewing Information to Facebook.

## VI.    CLASS ACTION ALLEGATIONS

61.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action on behalf of the following class (the "Class"):

> All persons in the United States with a newsletter subscription to the "people.com" or "ew.com" Websites owned and/or operated by Defendant that, within the statute of limitations, had their Personal Viewing Information disclosed to Facebook by Defendant.

62.    *Numerosity.* Members of the Class are so numerous that joinder of all class members is impractical. Given the popularity of the Websites, the number of persons in the class is estimated to be in the thousands.

63.    *Commonality and predominance.* A well-defined community of interest exists in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions affecting only individual Class members include:

(a)    Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)    Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally-identifiable information under the VPPA;

(c)    Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)    Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e)    Whether the Class is entitled to damages caused by Defendant's conduct.

64.    *Typicality.* Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, are newsletter subscribers who watched videos on the Websites and had their Personal Viewing Information collected and disclosed to Facebook by Defendant.

65.    *Adequacy.* Plaintiffs will adequately safeguard the interests of the Class members, as Plaintiffs' interests align with, and do not contradict, those of the Class. Plaintiffs' counsel has experience in handling class action litigation, including in the area of consumer digital privacy.

66.    *Superiority.* A class action is the most effective, efficient and fair way to resolve this dispute, as individual litigation by all Class members is impractical and would overburden the court system. It would also risk inconsistent judgments and increase delays and expenses for all parties involved. In contrast, proceeding as a class action presents few management challenges, conserves resources, and protects the rights of each Class member. Plaintiffs expect no difficulties in managing this case as a class action.

## VII.    CAUSE OF ACTION

**Violation of the Video Privacy Protection Act 18 U.S.C. § 2710, *et seq.***

Plaintiffs incorporates the above paragraphs by reference and says—

67.    Defendant is a "video tape service provider" because it has created, hosted and delivered thousands of videos on the Websites, thereby "engag[ing] in the business, in or affecting

interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. §2710(a)(4).

68.     Plaintiffs and members of the Class are "consumers" because they provided personal information to Defendant to sign up for a newsletter on the Websites. This makes them a "subscriber" and therefore a "consumer" under the VPPA. 18 U.S.C. § 2710(a)(1).

69.     Plaintiffs and Class members' Personal Viewing Information—including their FIDs, the title of videos watched, and the video URLs—is "personally identifiable information" because it because it identifies each Plaintiff and Class member to Facebook as an individual who watched videos on Defendant's Websites, including the specific video materials requested from the Websites. 18 U.S.C. §2710(a)(3).

70.     Plaintiffs and the members of the Class requested or obtained specific video materials from the Defendant by watching or viewing videos on the Defendant's People and Entertainment Weekly websites.

71.     Defendant knowingly disclosed Plaintiffs' and Class members' Personal Viewing Information to a third party, Facebook, using the Facebook pixel. The disclosure occurred knowingly because Defendant chose, programmed and intended for Facebook to receive the Personal Viewing Information.   Further, Defendant used the Personal Viewing Information to build audiences on Facebook and retarget those audiences for Defendant's own advertising campaigns.

72.     By disclosing Plaintiffs' and the Class members' Personal Viewing Information to Facebook, Defendant violated Plaintiffs' and the Class Members' statutorily protected right to privacy in their video-watching records and habits. 18 U.S.C. § 2710(c).

73.    Defendant did not obtain "informed, written consent" for the disclosure to Facebook of Plaintiffs' and Class Members' Personal Viewing Information in accordance with the requirements in 18 U.S.C. §2710(b)(2)(B).

74.    Defendant's disclosure to Facebook of Plaintiffs' and other Class Members' Personal Viewing Information did not occur within the "ordinary course of business." The disclosures to Facebook were not incident to "debt collection activities, order fulfilment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2), (b)(2)(E).

75.    As a result of the above violations, Defendant is liable to Plaintiffs and other Class Members for actual damages related to their loss of privacy, but not less than "liquidated damages in an amount of $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the VPPA, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VIII.   PRAYER FOR RELIEF

76.    Accordingly, Plaintiffs, on behalf of themselves and the proposed Class, respectfully requests that this Court grant judgment against the Defendant as follows:

(a)    an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representative of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)    an order declaring that Defendant's conduct violates the VPPA, under 18 U.S.C. § 2710(c)(2)(D);

(c) liquidated damages of $2,500 to each Plaintiff and each Class member, under 18 U.S.C. § 2710(c)(2)(A);

(d) punitive damages, as warranted, in an amount to be determined at trial, under 18 U.S.C. § 2710(c)(2)(B);

(e) prejudgment interest on all amounts awarded;

(f) an order of restitution and all other forms of equitable monetary relief;

(g) injunctive relief as pleaded or as the Court may deem proper; and

(h) an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, under 18 U.S.C. § 2710(c)(2)(C).

## IX. JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 30, 2025      Respectfully Submitted,


By: */s/ Mark Loevy-Reyes*
   *One of Plaintiffs' Attorneys*


Mark Loevy-Reyes
Jon Loevy (*pro hac vice* application forthcoming)
Michael I. Kanovitz (*pro hac vice* application forthcoming)
Thomas M. Hanson (*pro hac vice* application forthcoming)
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Tel: (312) 243-5900
anand@loevy.com
jon@loevy.com
mike@loevy.com
hanson@loevy.com

*Attorneys for Plaintiffs and the Putative Class*

**Appendix 1: image referred to above in paragraph 35**

