**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARI CARTAGENOVA, KEVIN MANSFIELD, AND ABBY MUSICK on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DOTDASH MEREDITH, INC.<br><br>Defendant. | Case No. 1:25-cv-11638 (NMG)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DOTDASH MEREDITH INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS


Page

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Dotdash Meredith's Limited Contacts With Massachusetts ..... 2

II. People and Entertainment Weekly ..... 3

III. Plaintiffs' VPPA Allegations ..... 4

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

I. The Court Lacks Personal Jurisdiction Over Dotdash Meredith. ..... 6

A. DDM Is Not Subject to General Jurisdiction in Massachusetts. ..... 6

B. DDM Is Not Subject to Specific Jurisdiction in Massachusetts. ..... 7

1. Plaintiffs Cannot Satisfy the Massachusetts Long-Arm Statute. ..... 7

2. Exercising Personal Jurisdiction Here Would Violate Due Process. ..... 11

II. Plaintiffs Have Failed To State a Claim Under the VPPA. ..... 14

A. Plaintiffs Do Not Plausibly Allege They are Consumers Under the VPPA. ..... 15

B. Plaintiffs Do Not Allege That DDM Disclosed PII. ..... 17

1. Plaintiffs Do Not Allege They "Requested or Obtained" Video Materials. ..... 17

2. Plaintiffs Have Not Alleged Circumstances Triggering a Disclosure. ..... 18

3. Plaintiffs Do Not Plausibly Allege Disclosure of Specific Videos ..... 18

4. Plaintiffs Have Not Adequately Alleged Their Facebook Profiles Identified Them. ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................5

*Chase v. Gist*,
2012 WL 1581682 (D. Mass. May 3, 2012) ....................8

*Connoisseurs Prods. Corp. v. Fresh Finest, LLC*,
2025 WL 786660 (D. Mass. Mar. 12, 2025) ....................7

*Egan v. X-Mode Social Inc*.,
2024 WL 2701967 (D. Mass. May 24, 2024) ....................14

*Frawley v. Nexstar Media Grp., Inc*.,
2023 WL 6065768 (D. Mass. Sept. 18, 2023) .................... *passim*

*Garagesocial, Inc. v. Hagerty Grp., LLC*,
2025 WL 1676511 (D. Mass. June 13, 2025) ....................9

*Ghanaat v. Numerade Labs, Inc*.,
689 F.Supp.3d 714 (N.D. Cal. 2023) ....................20

*Harlow v. Children's Hosp*.,
432 F.3d 50 (1st Cir. 2005) ....................11

*Heerde v. Learfield Communications, LLC*,
741 F.Supp.3d 849 (C.D. Cal. 2024) ....................20

*Hughes v. National Football League*,
2025 WL 1720295 (2d Cir. June 20, 2025) ....................1

*Krua v. Sirleaf*,
2019 WL 1936733 (D. Mass. May 1, 2019) ....................10

*Kuan Chen v. United States Sports Acad., Inc.*,
956 F.3d 45 (1st Cir. 2020) .................... *passim*

*Louis v. Flagship Airlines, Inc.*,
1999 WL 525947 (1st Cir. Feb. 5, 1999) ....................10

*A.G. ex. rel. Maddox v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013) ....................5

*Mass Schl. of L. at Andover, Inc. v. Am. Bar Ass'n*,
142 F.3d 26 (1st Cir. 1998) ........ 7

*Motus, LLC v. CarData Consultants Inc.*,
520 F.Supp.3d 87 (D. Mass. 2021) ........ 5, 6, 7, 13

*Newman v. Eur. Aeronautic Defence & Space Co. Eads N.V.*,
700 F.Supp.2d 156 (D. Mass. 2010) ........ 11

*Pettengill v. Curtis*,
584 F.Supp.2d 348 (D. Mass. 2008) ........ 10

*Pileggi v. Washington Newspaper Publishing Company*, *LLC*,
2025 WL 2319550 (D.C. Cir. Aug. 12, 2025) ........ 16

*Plixer Int'l, Inc. v. Scrutinizer GmbH*,
905 F.3d 1 (1st Cir. 2018) ........ 12

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) ........ *passim*

*Restuccia v. H&R Block Tax Servs. LLC*,
2021 WL 4658734 (D. Mass. Oct. 7, 2021) ........ 10

*Rodriguez v. JP Boden Services Inc.*,
2024 WL 559228 (S.D. Cal. Feb. 12, 2024) ........ 16

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2024) ........ 16

*Salazar v. Paramount Glob.*,
133 F.4th 642 (6th Cir. 2025) ........ 16, 17

*Solomon v. Flipps Media*,
2025 WL 1234567 (2d Cir. May 1, 2025) ........ 1

*Tobias v. Smith*,
2022 WL 1129376 (D. Mass. Apr. 15, 2022) ........ 5

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ........ 15, 17, 19

**Statutes**

18 United States Code ("Video Privacy Protection Act")
§ 2710(a)(1) ........ 15
§ 2710(a)(3) ........ 15, 17
§ 2710(b)(1) ........ 15

Mass. Gen. Laws Ann. ch. 223A ("Mass. Long-Arm Statute")
§ 3 .......... *passim*
§ 3(a) .......... 7, 8
§ 3(c) .......... 7, 9, 10
§ 3(d) .......... 7, 10, 11

**Rules and Regulations**

Fed. R. Civ. P.12(b)(2) .......... 5
Fed. R. Civ. P. 12(b)(6) .......... 5, 15

**Other Authorities**

134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) .......... 18, 19
U.S. Const. Amend. XIV ("Due Process Clause") .......... 7
Senate Report 100-59 .......... 19

## INTRODUCTION

This putative class action arrives in Massachusetts only because Plaintiffs went hunting for a friendlier forum after their identical lawsuit collapsed when the Second Circuit foreclosed Pixel-based claims like theirs under the Video Privacy Protection Act ("VPPA").[1] Dotdash Meredith Inc. ("DDM")—a Delaware corporation headquartered in New York with no offices, facilities, or meaningful or relevant revenue in Massachusetts—has been dragged here on the thinnest of jurisdictional reeds: because DDM's national websites, People.com and EW.com (together, the "Websites") and their free e-mail newsletters, can be viewed in Massachusetts, just as they can be viewed from anywhere else. But that is the ordinary operation of the internet, and it is nowhere near enough to hale a non-resident publisher into this Court.

Even if they could establish personal jurisdiction in this Court, Plaintiffs' single count Complaint under the VPPA fails to state a claim. They have recast the 1988 VPPA—enacted in response to the 1987 publication of Judge Robert Bork's video rental history from a local store during his Supreme Court nomination process—as a boundless internet-privacy statute. But the VPPA protects only "consumers" of "video tape service providers"—those who rent, purchase, or subscribe, as defined in the statute. Here, Plaintiffs allege only that they signed up for a free email newsletter from People or EW and then, separately, at some unspecified time, watched videos on the Websites—videos that automatically played and are available to every site visitor. The newsletter sign-up has nothing to do with accessing or viewing videos, and Plaintiffs' casual sign-up for an email does not transform them into "consumers" entitled to bring a VPPA claim.

---

[1] As described in *Hughes v. National Football League*, 2025 WL 1720295 at *2 (2d Cir. June 20, 2025) (summary order), the decision in *Solomon v. Flipps Media*, 2025 WL 1234567 (2d Cir. May 1, 2025), "effectively shut the door for Pixel-based VPPA claims" in the Second Circuit. *See also* Declaration of J. Bishop ("Bishop Decl.") ¶ 9.

Nor do Plaintiffs plausibly allege that any protected information under the VPPA was actually disclosed. The VPPA prohibits video tape service providers from knowingly disclosing information that identifies a consumer as having requested or obtained specific video materials. Plaintiffs summarily claim that they visited the Websites and viewed some unspecified video content that autoplayed. Plaintiffs claim that as a result, DDM disclosed to Facebook information concerning those videos through of a piece of website code. But these allegations fall short for numerous reasons: they fail to allege Plaintiffs actually requested or obtained specific video materials or that a disclosure actually occurred for each of them, much less that Facebook received information that identified them and the specific video they allegedly watched.

In short, Plaintiffs have filed in the wrong court with a wrong theory. Personal jurisdiction is absent, their claim is legally deficient, and their transparent forum shopping should not be rewarded. The Complaint should therefore be dismissed.

## BACKGROUND

### I. Dotdash Meredith's Limited Contacts With Massachusetts

DDM is a digital and print publishing company incorporated in Delaware and headquartered in New York. (Compl. ¶ 2.) DDM, through subsidiaries, owns 40 different brands. (Bishop Decl. ¶ 4.) Not a single one of those brands publishes out of Massachusetts. (*Id*. ¶ 6). DDM owns no real estate here, and maintains no offices here. (*Id*.) Of DDM's entire workforce of 3,100 employees, only a handful—27 employees—happen to reside in Massachusetts. Just two of them work for People, and neither have involvement in website operations. (*Id*. ¶ 7.) None of the Massachusetts-based employees are dedicated to Entertainment Weekly. (*Id*.)

## II. People and Entertainment Weekly

People and Entertainment Weekly are national publications, delivering celebrity news and human-interest stories to a broad nationwide audience. The Websites are accessible to anyone with an internet connection—no registration or subscription required. (Declaration of A. Brez Decl. ("Brez Decl") ¶ 19.) The sites do not know where exactly any particular visitor is physically located. (*Id*. ¶¶ 12, 13.) At best, both People and EW may be able to infer the general location based on the IP address (the network location of the device) associated with the visitor's internet access point. (*Id*.) Notably, however, the IP address never shows a website visitor's precise location, and does not even always show the visitor's actual general location, such as when the visitor is using a virtual private network or "VPN." (*Id*. ¶ 14.) Only 3.02% and 2.66% of visitors to people.com and ew.com, respectively, came from visitors to the websites using IP addresses that are typically associated with a general location in Massachusetts. (*Id*. ¶ 16.)

The Websites offer visitors the opportunity to sign up to receive any of multiple free email newsletters on different topics. According to Plaintiffs, DDM is subject to personal jurisdiction here "because it directly sends its newsletters to IP addresses associated with physical addresses" in Massachusetts and, based on Plaintiffs' information and belief, DDM "regularly… advertise[s] its newsletters and website videos" to Massachusetts residents. (*Id.* ¶ 12.) Neither People nor EW specifically target Massachusetts residents or the Massachusetts market in advertising their newsletters, their respective Websites, or any other product they offer. (*Id.* ¶ 22.) People and EW also do not collect geolocation information from newsletter registrants, and can only determine a newsletter's potential general location based on the IP address associated with the internet access point the newsletter recipient is using when engaging with an email (*Id*. ¶ 20.)

**III. Plaintiffs' VPPA Allegations**

Plaintiffs allege that when a person browses the Websites and "interacts with" a video, DDM "discloses" to Facebook a string of numbers that correlates to the user's Facebook ID, along with the URL of the page with the article the user visited, and the title of the video on the article page. (Compl. ¶ 34.) Their only example of the purported data transmission is a screenshot relating to the people.com article titled "See Miley Cyrus' Many Outfit Changes as She Teases She 'Forgot' Her Underwear in Final Dress." (*Id.* ¶ 35.) There are no examples from EW, and the one included example is not tied to any named Plaintiff. Without citing any reason for their belief, Plaintiffs claim that the title of the video that was shared is "Miley Cyrus Nails 5 Outfit Changes at 2024 Grammys | Photos," which is contained in a line of code that is prefaced by "cd[pageFeatures]". (*Id.*) However, Plaintiffs do not claim that Facebook understood "cd[pageFeatures]" to reference a video title or that DDM programmed that line to reference a video title as opposed to some other page features, such as an alternative title of the page. According to Plaintiffs, the video, with no apparent title visible, automatically plays when one navigates to the article page, as do all videos on the site. (*Id.* ¶ 22.)

Separately, Plaintiffs allege they signed up for free newsletters (an ew.com newsletter for Mansfield and Cartagenova, the latter being the only Massachusetts named Plaintiff, and a people.com newsletter for Musick). (*Id.* ¶¶ 47, 52, 57.) Plaintiffs did not provide their name or address to sign up for the newsletter, only their email addresses. (*Id.*) They claim an IP address was also transmitted at sign-up. (*Id.* ¶¶ 48, 53, 58.) Plaintiffs do not specify which People or EW newsletter they signed up for, what content they received, or how this relates to any video they watched. In fact, there are no allegations that signing up for a newsletter had *anything* to do with

watching videos. Any person browsing the web could watch videos on the Websites; the sole example cited is available to anyone with an internet connection. (*Id.* ¶ 35.)

## LEGAL STANDARD

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of proving jurisdiction exists. Under the prima facie standard, where the court "is called to" decide the motion "without first holding an evidentiary hearing," the plaintiff cannot merely rely on "unsupported allegations" in the complaint. *Tobias v. Smith*, No. CV 21-11736-FDS, 2022 WL 1129376, at *2 (D. Mass. Apr. 15, 2022). Instead, the plaintiff "must put forward evidence of specific facts to demonstrate jurisdiction exists." *Id*. (internal citation omitted). In federal question cases such as this one, when "the federal statute is silent on the availability of nationwide service of process," as the VPPA is, "and nothing in the record indicates that defendant is excluded from the jurisdictional reach of every state," the plaintiff must satisfy the forum state's long-arm statute. *Motus, LLC v. CarData Consultants Inc.,* 520 F.Supp. 3d 87, 90–91 (D. Mass. 2021), *aff'd*, 23 F.4th 115 (1st Cir. 2022). Therefore, "this Court must conduct the same personal jurisdiction inquiry as in a diversity case, focusing on [DDM's] contacts with Massachusetts rather than with the United States as a whole." *Id*. at 91.

Under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570 (2007)). To survive a motion to dismiss for failure to state a claim, the plaintiff must show "more than a sheer possibility" of liability. *A.G. ex. rel. Maddox v. Elsevier, Inc.,* 732 F.3d 77, 80 (1st Cir. 2013) (citation omitted).

## ARGUMENT

### I. The Court Lacks Personal Jurisdiction Over Dotdash Meredith.

Plaintiffs cannot meet their burden of demonstrating that this Court has personal jurisdiction over DDM because DDM is subject to neither general jurisdiction in Massachusetts, nor to specific jurisdiction under the Massachusetts' long-arm Statute. Mass. Gen. Laws Ann. ch. 223A, § 3 ("Long-Arm Statute"); *Frawley v. Nexstar Media Grp., Inc.*, 2023 WL 6065768, at *4–5 (D. Mass. Sept. 18, 2023). Plaintiffs cannot show, as required, that the Court's exercise of jurisdiction over DDM would comport with the requirements of Due Process. *Motus*, 520 F.Supp.3d at 90.

#### A. DDM Is Not Subject to General Jurisdiction in Massachusetts.

DDM is not subject to general jurisdiction in Massachusetts because it is not at "home" here. A corporation is considered "at home" in "its state of incorporation and the state that houses its principal place of business." *Frawley*, 2023 WL 6065768 at *4, n. 1(citation omitted). Plaintiffs themselves concede that DDM is a Delaware corporation, with its principal place of business in New York. (Compl. ¶ 8); (Bishop Decl. ¶ 3.) DDM's operations in Massachusetts are essentially non-existent: it has no offices, assets, or real estate here, and only a handful of employees out of its entire workforce happen to reside in Massachusetts. (Bishop Decl. ¶ 7.) DDM's general business operations in Massachusetts are not "so unusually substantial" and "sufficiently continuous and systematic 'as to render [it] essentially at home'" here. *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 57 (1st Cir. 2020). The fact that the Websites or newsletters are available in Massachusetts is meaningless; "the mere whiff of a virtual presence" is not enough. *Id.*, 956 F.3d at 57-58.

### B. DDM Is Not Subject to Specific Jurisdiction in Massachusetts.

Plaintiffs must establish that specific jurisdiction is "1) is permitted by the forum's long-arm statute, and 2) coheres with the Due Process Clause of the Fourteenth Amendment . . . ." *Motus, LLC*, 520 F.Supp.3d at 91. Plaintiffs fail on both fronts.

#### 1. Plaintiffs Cannot Satisfy the Massachusetts Long-Arm Statute.

A claim must arise from the activities alleged to satisfy the Long-Arm Statute. *Connoisseurs Prods. Corp. v. Fresh Finest, LLC*, 2025 WL 786660, at *5 (D. Mass. Mar. 12, 2025). Here, Plaintiffs' claims are premised on the alleged violation of the VPPA through the Websites; any jurisdiction must be rooted in those Websites' alleged activities in Massachusetts. *See, e.g., Mass Schl. of L. at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (exercise of specific jurisdiction is limited to when there is a "demonstrable nexus between a plaintiff's claims and a defendant's forum based activities"). The only potential hooks are Section 3(a) (claims arising from "transacting any business in this commonwealth") or Section 3(c) (claims arising from "causing tortious injury by an act or omission in this commonwealth"), but neither applies. And Section 3(d) of the Long-Arm Statute is unavailable because this Court lacks general jurisdiction over DDM.[2]

##### a. Plaintiffs' claims do not arise from People, EW, or DDM's transaction of business in Massachusetts.

For jurisdiction to exist under Section 3(a) of the Long-Arm Statute, Plaintiffs must show that People or EW transacted business in Massachusetts *and* their claim arose from the transaction. *Frawley*, 2023 WL 6065768 at *4. Thus, the only activities that could satisfy the requirements of Section 3(a) are those related to Plaintiffs' interaction with videos on the

---

[2] DDM has identified those sections that it believes Plaintiffs may argue as applicable. If Plaintiffs argues a different jurisdictional premise, DDM reserves the right to contest any such arguments and does not concede that Plaintiffs can establish jurisdiction on any other ground.

Websites, as that is the mechanism through which the alleged illegal disclosure occurred. *E.g.*, (Compl. ¶ 33) ("[DDM] installed Facebook pixel on the Websites"; (¶ 34) ("pixel on the Website [] send[s] specific data to Facebook when a user who is viewing a video interacts with the video").

The mere fact that People and EW offer websites accessible in Massachusetts is "insufficient, without more, to constitute 'transacting business'" within the meaning of the statute. *Frawley*, 2023 WL 6065768 at *4 (citing *Chase v. Gist*, 2012 WL 1581682 at *3 (D. Mass. May 3, 2012)). In any event, even assuming that any of People or EW's activities through their respective websites have any effect on the commerce of the Commonwealth at all, such effects are minimal. Contacts with Massachusetts that only have a "slight effect" on commerce within the state do not fall within the statute. *Id*. Moreover, People, EW, and DDM do not "transact business" in Massachusetts because they do not actively solicit Massachusetts residents to sign up for a newsletter, including Plaintiff Cartagenova or any other Massachusetts resident, more than they do for any other state. (Brez Decl. ¶ 22.) In any event, only a small percentage of visitors to the Websites even reside in Massachusetts. (*Id*. ¶ 16.)

*Frawley,* a Pixel-based VPPA case, is directly on point. There, the plaintiff allegedly received a free email newsletter from *The Hill*, owned by defendant Nexstar. *Frawley*, 2023 WL 6065768 at *4. The court found that Section 3(a) did not apply because the defendant's contacts in Massachusetts were "not related to the controversy" and "played no role in the 'train of events' that resulted in the alleged injury." *Id*. at *4 (internal citation omitted). The plaintiff argued that the media defendant's website solicited consumers in Massachusetts to sign up for its digital and print newspaper and "that the injury he suffered occurred in the Commonwealth." *Id*. The court found, however, that the defendant's free newsletter could not be said "to have more

than a 'slight effect on the commerce of the Commonwealth' since it is merely operating a website that provides free content." *Id.* (citation omitted). The plaintiff did not make any assertion that the defendant "actively solicited Massachusetts citizens more than citizens of any other state." *Id.* The court therefore ultimately noted that "[t]he defendant's only relevant presence in Massachusetts here is the availability of the website . . . which is insufficient, without more, to constitute 'transacting business.'" *Id.* (quoting *Chase*, 2012 WL 1581682 at *3).

Plaintiffs' claims here should also fail. Plaintiffs do not (and cannot) allege that DDM (nor People or EW) have taken any action to target Massachusetts residents, to advertise in the Commonwealth, or to solicit newsletter readership in Massachusetts more so than any other state. (*See* Compl. ¶ 12.) Nor do they allege that the People and EW newsletters have more than a "slight effect" on the commerce of Massachusetts, given that the newsletters are free and the Websites provide free content. Like the entities in *Frawley*, here, Defendant's only relevant presence in Massachusetts is the operation of its website, which is, without more, clearly insufficient to constitute transacting business.

**b. DDM has not caused "tortious injury by an act or omission in" Massachusetts.**

Plaintiffs have similarly failed to establish that jurisdiction under Section 3(c) of the Long-Arm Statute applies because they cannot establish that their "action arises from [DDM] causing tortious injury by an act or omission in Massachusetts." *Garagesocial, Inc. v. Hagerty Grp., LLC*, 2025 WL 1676511, at *4 (D. Mass. June 13, 2025) (quotation omitted). Ultimately, "Section 3(c) 'is intended to apply only when the act [or omission] *causing* the injury *occurs within the Commonwealth*.'" *Id.* (emphasis added). Notably, "the fact that [ ] 'harm' is felt by [a plaintiff] in Massachusetts does not mean that infringement occurred here." *Id.* (citation omitted).

Plaintiffs allege generally that EW newsletter subscriber Plaintiff Cartagenova has resided and been domiciled in Massachusetts. (Compl. ¶¶ 5, 47.) Absent specifics about how DDM, and more specifically, EW, took actions or made omissions *in Massachusetts*, Plaintiffs cannot establish personal jurisdiction under 3(c). At most, Plaintiffs allege that DDM "directly sends its newsletters to IP addresses associated with physical addresses in the State" (Compl. ¶ 12), but the act of sending the newsletter is not the cause of the purported injury at issue, nor is their receipt. Regardless, Plaintiffs do not allege that DDM sent the newsletter *from* Massachusetts, only that recipients of them may have used "IP addresses associated" with Massachusetts. Further, Plaintiffs do not allege that any decisions relevant to the pixel at issue were made in Massachusetts or that DDM installed the pixels in Massachusetts. Accordingly, Section 3(c) of the Long-Arm Statute does not apply – the only relevant actions were taken by Plaintiff Cartegenova, not DDM or EW. *See Louis v. Flagship Airlines, Inc.,* 1999 WL 525947, at *2 (1st Cir. Feb. 5, 1999) (Section 3(c) was inapplicable because the defendant's actions took place entirely in North Carolina).

**c. Dotdash Meredith neither caused tortious injury nor regularly does or solicits business in Massachusetts.**

Plaintiffs similarly cannot rely on Section 3(d) of the Long-Arm Statute, which applies "only if general jurisdiction exists" over the defendant. *Pettengill v. Curtis*, 584 F.Supp.2d 348, 357 (D. Mass. 2008). *See also Frawley*, 2023 WL 6065768, at *4 ("the Court can only rely on Section 3(d) when it has general jurisdiction over the defendants").[3] As noted above in *supra*

[3] *See also Restuccia v. H&R Block Tax Servs. LLC*, 2021 WL 4658734, at *5 (D. Mass. Oct. 7, 2021) (same); *Krua v. Sirleaf*, 2019 WL 1936733, at *4 (D. Mass. May 1, 2019) (same).

section IA, general jurisdiction does not exist here because DDM is not "at home" in Massachusetts. *E.g. Frawley*, 2023 WL 6065768, at *4.

DDM recognizes that another district court found that Meredith Corporation was subject to 3(d) of the Long-Arm Statute based on $70,000 in advertising revenue generated from Allrecipes' mobile app that was run on devices physically located in Massachusetts. *Rancourt v. Meredith Corp.*, 2024 WL 381344 (D. Mass. Feb. 1, 2024).[4] Yet the underlying facts in *Rancourt* were entirely different than those alleged here, as they involved an app that was installed on devices in Massachusetts that allegedly had geolocation tracking abilities through the mobile device's GPS system, enabling the defendant to purportedly determine the "meaningful location" of the user. *Id.* at *2. In turn, the defendant was able to determine advertising revenue from the Allrecipes app *specific* to devices physically located in Massachusetts. *Id.* Here, however, there are no comparable allegations, not even that geolocation tracking is employed.[5]

**2. Exercising Personal Jurisdiction Here Would Violate Due Process.**

Even if Plaintiffs could satisfy the Long-Arm Statute—which they cannot—exercising personal jurisdiction over DDM would violate Due Process. "[T]he Due Process Clause imposes three requirements for exercising specific jurisdiction over out-of-forum defendants." *Chen*, 956 F.3d at 59. First, "the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum." *Id*. Second, "the defendant's forum-state contacts must 'represent a

---

[4] Allrecipes' operations, assets, and liabilities are held by a DDM subsidiary that is separate from the subsidiary that holds People and EW's operations, assets, and liabilities. (*See* Bishop Decl. ¶ 5.)

[5] Further, while the *Rancourt* court deemed $70,000 over two years to be "substantial" revenue, the First Circuit has found that even revenue in the millions of dollars is not "substantial." *Harlow v. Children's Hosp*., 432 F.3d 50, 66 (1st Cir. 2005) ($2 million annually not substantial); *see also Newman v. Eur. Aeronautic Defence & Space Co. Eads N.V.*, 700 F.Supp.2d 156, 167 (D. Mass. 2010) ($2.5 million not substantial).

purposeful availment of the privilege of conducting activities in that state.'" *Id*. Third, "the exercise of specific jurisdiction in the forum must be reasonable under the circumstances." *Id.* "Failure to make any one of these showings" is fatal to specific personal jurisdiction. *Id*.

**a. No purposeful availment.**

"When, as here, the contacts in question are related to a website that is available in the forum but that is operated outside of it, the Court's focus should begin with the purposeful availment prong." *Frawley*, 2023 WL 6065768, at *5. To demonstrate purposeful availment, the court considers "voluntariness" and "foreseeability"—meaning "the contacts must be voluntary rather than the result of unilateral actions of another party" and they must also be sufficient to give the defendant notice '"such that [it] could 'reasonably anticipate being haled into court' involuntarily in the Commonwealth." *Id*. (citations omitted). Plaintiffs cannot satisfy either voluntariness or foreseeability based solely on allegations that website or newsletters were available to Massachusetts residents. *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 8 (1st Cir. 2018) (describing "baseline principle" that "a website operator does not necessarily purposefully avail itself of the benefits and protections of every state in which its website is accessible."). Plaintiffs must point to "something more" for purposeful availment. *Id*.

In *Chen*, the First Circuit held that the plaintiff had not shown the defendant had "purposefully availed" itself of doing business in Massachusetts, even though the defendant solicited Massachusetts-based students through its website, operated an online education platform available nationwide, including by Massachusetts residents, and obtained tuition from the Massachusetts plaintiff. *Chen*, 956 F.3d at 61. Regarding voluntariness, the Court found that "[the defendant] [n]either aims its informational website specifically at prospective students in Massachusetts [n]or derives significant revenue from Massachusetts-based individuals through

its maintenance of this web-site." *Id*. at 60. Regarding foreseeability, the Court noted that while the defendant could have anticipated Massachusetts residents to enroll in its program, that was a "broad and generic degree of foreseeability" that was "insufficient" for purposeful availment. *Id*.

Here, the contacts with this forum are even more sparse than in *Chen.* Plaintiff does not and cannot allege that there was any specific targeting of Massachusetts. Any case-specific contacts with Massachusetts are from Plaintiff Cartegenova's *own* activity—voluntarily signing up to receive a free newsletter and accessing free content on EW.com.

The facts here also stand in contrast to those in *Rancourt*. There, the court found purposeful availment where the mobile app installed on devices in Massachusetts allegedly collected users' precise GPS location data, tracked Massachusetts users, and delivered targeted advertising based on that precise location. The app's business model allegedly monetized Massachusetts-based user data, and the defendant affirmed that it could identify revenue from its Massachusetts user base. Here, DDM's websites do not collect GPS or other precise location data, do not track users specifically by state, and do not target Massachusetts residents in any way. The only "contact" is the passive accessibility of the sites by anyone, anywhere.

**b. No Relatedness.**

The relatedness prong requires a "'demonstrable nexus' between the claims of the plaintiff and the defendant's contacts in the forum state." *Motus*, LLC, 520 F.Supp.3d 91 (internal citation omitted). The only nexus that Plaintiffs point to between the alleged violation and Massachusetts was the receipt of the email newsletter by one Plaintiff in Massachusetts (*e.g.* Compl. ¶ 49), but the receipt of an email does not give rise to a VPPA violation. Plaintiffs do not plead that the alleged violation—DDM's disclosure of data to Facebook through pixels on the Websites—is tied to any act or omission in Massachusetts, and thus the claim is not related to the

Commonwealth. *See Egan v. X-Mode Social Inc*., 2024 WL 2701967 (D. Mass. May 24, 2024) (holding that even though the initial collection of geolocation data was in Massachusetts through defendant's app, that was not enough to make the claim—the sale of that geolocation data—related to Massachusetts). Nor is it plausible that the allegedly violating disclosure would be related to Massachusetts—the allegations are that DDM, a New York-based company, disclosed data to third party, Facebook. Further, the Websites do not collect geolocation data, track users by physical location, or target Massachusetts residents.

#### c. No Reasonableness.

Finally, the exercise of jurisdiction must be reasonable under the circumstances. *Chen*, 956 F.3d at 59. Litigating in a Massachusetts forum imposes a burden on DDM, which does not have employees in this state who can testify about the claims. In contrast, in *Rancourt*, the court found reasonableness because the defendant had a measurable user base and derived specific revenue from Massachusetts devices, which were tied to the specific claims at issue—facts not present here. Further, while Massachusetts may have an interest in protecting the rights of its citizens, this case does not raise any novel issues that would impact Massachusetts law—rather, Plaintiffs' complaint is based exclusively on a federal statute and the identical complaint was previously filed in New York, where DDM is headquartered. Simply put, Massachusetts has no special stake in this case, and DDM reasonably expects not to be haled into court in Massachusetts. The Court should dismiss for lack of personal jurisdiction.

## II. Plaintiffs Have Failed To State a Claim Under the VPPA.

Even if this Court were to find personal jurisdiction, the Complaint should nonetheless be dismissed under Rule 12(b)(6). The VPPA is not a catch-all privacy statute; it imposes demanding requirements. To state a claim, Plaintiffs must plausibly allege both that they are

"consumers" and that DDM "knowingly" disclosed their personally identifiable information ("PII") to a third party. 18 U.S.C. § 2710(b)(1). A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* at § 2710(a)(1). PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* at § 2710(a)(3). Plaintiffs' allegations fall short on both.

**A. Plaintiffs Do Not Plausibly Allege They are Consumers Under the VPPA.**

Plaintiffs do not claim that they rented or purchased anything from DDM. Their only option to state a claim is to shoehorn themselves into "subscribers" under the VPPA. *Id.* § 2710(a)(1). But they have not alleged any nexus between the goods and services they subscribed to and the video materials they allege to separately have watched. If every person who subscribes to a free newsletter is a consumer of a videotape service provider as Plaintiffs contend, the word "subscriber" in the statute is stripped of all meaning—the website operator has no way of knowing which visitors to its free, openly accessible website have also separately signed up for a free newsletter on a potentially unrelated topic. Plaintiffs make no allegations otherwise.

Crucially, Plaintiffs do not allege that their newsletter sign-up had anything to do with watching videos, or that the newsletters themselves provided access to or linked to video content. This is a world apart from *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482 (1st Cir. 2016), where the plaintiff's app subscription was the very means of accessing the videos at issue. Here, the Plaintiffs' purported "subscription" is entirely severable from their alleged video viewing—just as if they had visited any of millions of websites through a browser, with no ongoing relationship or exchange of value. In contrast, in *Yershov*, "access was not free of a commitment to provide consideration . . . ." *Id.*; *see also Rancourt* 2024 WL 381344 at *13 ("Mr. Rancourt was required to register for the App and to create an Allrecipes account. His

decision to download the App, as opposed to using an internet browser to access Allrecipes content, evidences an intent to have an ongoing relationship or association with the App.").

The terms "goods and services" within the definition of "consumer" under the VPPA—specifically, "a renter, purchaser or subscriber of goods and services from a video tape service provider"—must be read in context with the rest of the statute and its purpose. When properly read in context, it is clear that "consumer" cannot mean anyone who simply signs up for a free, unrelated newsletter. As the Sixth Circuit explained in *Salazar v. Paramount Glob.*, 133 F.4th 642 (6th Cir. 2025), the "most natural reading . . . , shows that a person is a 'consumer' only when he subscribes to 'goods or services' in the nature of 'video cassette tapes or similar audio visual materials.'" *Id.*[6] The D.C. Circuit recently echoed this analysis in *Pileggi v. Washington Newspaper Publishing Company, LLC*, 2025 WL 2319550 (D.C. Cir. Aug. 12, 2025), rejecting the notion that "Congress meant for an omitted adjective in the first half of the definition of 'consumer' to transmogrify the Act into a much more sweeping and administrable website privacy statute that inexplicably turns on purchasing something—anything—at some however-distant point in time before viewing a video." *Id.* at *11. In other words, Congress "did not protect every person who sees a video somehow." *Id.*; *see also Rodriguez v. JP Boden Services Inc.*, 2024 WL 559228, at *4 (S.D. Cal. Feb. 12, 2024) ("To isolate the understanding of 'goods and services' from 'video tape service provider' as [p]laintiff suggests would ignore the purpose of the statute, which is to prohibit entities which primarily serve as audio video providers from disclosing an individual's viewing history to others."). In *Salazar* and *Pileggi*, like here, the

[6] DDM recognizes that there is a Circuit split with regard to the interpretation of "consumer" under the VPPA. The defendant in *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024), has filed a petition for writ of certiorari with the United States Supreme Court. No. 24-994 (U.S. filed Mar. 18, 2025).

"relevant videos were accessible to anyone, even those without a newsletter subscription, by going directly to" the website. *Salazar*, 133 F.4th at 653 .

Ultimately, Plaintiffs have no relationship with DDM as contemplated by the VPPA; they are indistinguishable from that of any other casual web surfer on the Websites.

**B. Plaintiffs Do Not Allege That DDM Disclosed PII.**

In the First Circuit, PII comprises "information reasonably and foreseeably likely to reveal which … videos [a person] has obtained." *Yershov*, 820 F.3d at 486. Plaintiffs have not alleged that DDM disclosed information to Facebook that is reasonably or foreseeably likely to reveal to Facebook the specific videos they requested or obtained for multiple reasons: they have not alleged they requested or obtained videos in the first instance; they have not alleged that the circumstances that they claim trigger disclosure actually occurred with regard to each named Plaintiff; they have not alleged that the alleged disclosure revealed to Facebook the specific video title; and they have not alleged that their Facebook ID actually revealed their identity to Facebook.[7] All of these allegations provide independent grounds to dismiss this lawsuit.

**1. Plaintiffs Do Not Allege They "Requested or Obtained" Video Materials.**

PII encompasses information which identifies a person "as having ***requested or obtained*** specific video materials." 18 U.S.C. 2710(a)(3). Plaintiffs plead themselves out of court on this threshold element because they specifically allege that the videos on both People's and EW's websites *automatically* play when one visits the site. (Compl. ¶ 22.) ("The videos are embedded alongside text articles, and the videos autoplay when users visit webpages and articles on the Websites."). This is no different than a movie that is playing on the television screens in an electronics store. There is no voluntary action on the part of the user to play it—he or she has not

[7] Notably, Plaintiffs' allegations regarding PII would not survive in the Second Circuit where this action was originally filed, which is why Plaintiffs have filed in this Court.

"requested or obtained" that video as the statute requires. Any contrary holdings do not reflect the intent of the VPPA. The VPPA's legislative history reflects a clear concern for safeguarding the confidentiality of deliberate video viewing *choices*. *See* 134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) (Sen. Leahy: "This measure will ensure that the *choice* of…movies we view will be protected against unlawful disclosure…. our right to privacy protects the choice of movies that we watch with our family in our own home") (emphasis added). Accordingly, Plaintiffs' own allegations demonstrate that any disclosures do not reveal videos requested or obtained by Plaintiffs.

**2. Plaintiffs Have Not Alleged Circumstances Triggering a Disclosure.**

Even if the Court were to find that automatically playing videos satisfied the statute, Plaintiffs own allegations demonstrate that a disclosure did not occur as to their own video-watching behavior. Plaintiffs allege that the Facebook pixel "can be programmed by the business to send information to Facebook when users perform specific actions on the website." (Compl. ¶ 32.) Plaintiffs allege that DDM "configured the pixel on the Website to send specific data to Facebook when a user who is viewing a video *interacts with the video* by clicking on it, such as to pause the video, play the video, adjust the volume, or adjust the size of the video player." (*Id.* ¶ 34; emphasis added.) Therefore, according to Plaintiffs' own allegations, the purported disclosure—sending information to Facebook—takes place when a user *interacts* with the video, not just when he or she watches it. None of the Plaintiffs allege that they actually interacted with any video, just that they "watched" videos that autoplayed. (Compl. ¶¶ 49, 50, 54.) According to Plaintiffs' own allegations, they have not pled that a disclosure actually occurred.

**3. Plaintiffs Do Not Plausibly Allege Disclosure of Specific Videos.**

Plaintiffs have not pled that any disclosures to Facebook would reveal to Facebook the *specific* audiovisual material selected by Plaintiffs. The VPPA was enacted to prevent the

disclosure of a person's private video choices, in circumstances where the disclosure would easily identify the specific title of the video. *See* Senate Report 100-59 (describing list of movies Bork rented, the publication of which spurred the VPPA); 134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) ("[W]hat the law should not allow, is that a detailed list of their previous rentals - the titles of the films, the dates they were rented - will be disclosed to other[s]. . . ."). To start, it's not even clear how Plaintiffs purportedly determined what the title of the video on the cited page is—no title is visible on the page and the code they show does not indicate the cited title is the title of a video, as opposed to any other page feature, such as the alternative title of the page. Moreover, even assuming Plaintiffs have plausibly pled the correct title of video, Plaintiffs do not allege how one would connect the alleged title of the video shown in their screenshot with the actual short video on the website.[8]

More critically, Plaintiffs do not allege that Facebook itself understands that "Miley Cyrus Nails 5 Outfit Change at 2024 Grammys | Photos" is the title of the video on the article page, as opposed to a reference to any other feature on the page. There is no allegation, for example, that Facebook interprets the one line of code prefaced by "cd[pageFeatures]:" to reference the title of a video on the page or even that DDM programmed it to reference videos. These failures are significant because under *Yershov*, for a disclosure to contain PII, it must *reveal* which videos a person has obtained. 820 F.3d at 486. Here, Plaintiff has not alleged that this line of code reveals that information to Facebook specifically.

---

[8] This differs from *Rancourt*, for example, where the plaintiff alleged that a Google search including the video ID will reveal the specific video watched. 2024 WL 381344 at *2. Here, there is no such connecting allegation.

**4. Plaintiffs Have Not Adequately Alleged Their Facebook Profiles Identified Them.**

Finally, Plaintiffs' VPPA claim fails for the independent reason that Plaintiffs have not alleged that their Facebook profiles were sufficiently identifying of each of them such that Facebook could identify them from their Facebook ID ("FIDs"). Though DDM recognizes that courts in this Circuit have acknowledged that an FID is a unique identifier that can allow for the discovery of the user's identity, whether it does so depends on what information is associated with that FID. A page with a false name and a photo of a sunset, for example, does not comprise information reasonably and likely to identify a person. *See, e.g., Heerde v. Learfield Communications, LLC*, 741 F.Supp.3d 849, 857 (C.D. Cal. 2024) ("For a Facebook ID to be personally identifying, "the person's Facebook profile [must be] publicly accessible and include[] sufficient identifying information."); *Ghanaat v. Numerade Labs, Inc.*, 689 F.Supp.3d 714 (N.D. Cal. 2023) ("Here, plaintiffs' allegations are inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses."). Plaintiffs allege that they have Facebook accounts, but not what is on those Facebook accounts, or whether Plaintiffs use their real names on those Facebook accounts. While Plaintiffs claim that the Facebooks' Community Guidelines require the use of "real identities" (Compl. ¶ 26), there is no allegation that each Plaintiff actually followed these Guidelines or that Facebook enforced them. Accordingly, the Complaint does not adequately allege that the disclosure of the FIDs results in the sharing of any protected personal information.

## CONCLUSION

For the foregoing reasons, Defendant Dotdash Meredith, Inc. respectfully requests that this Court dismiss Plaintiffs' Complaint, in its entirety, with prejudice.

Dated: August 22, 2025

Respectfully submitted,

DOTDASH MEREDITH, INC.

By its attorneys,

/s/ *Tony K. Lu*
Tony K. Lu (BBO# 678791)
DENTONS US LLP
101 Federal Street
Suite 1900
Boston, Massachusetts 02110
(617) 235-6817 (telephone)
(617) 235-6899 (fax)
tony.lu@dentons. com

Kristen C. Rodriguez (*admitted pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
Email: kristen.rodriguez@dentons.com

Lyndsey M. Wajert (*admitted pro hac vice*)
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
Email: lyndsey.wajert@dentons.com

**CERTIFICATE OF SERVICE**

I certify that on August 22, 2025, I caused to be filed electronically a true copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify the parties of record via electronic notification.

/s/ *Tony K. Lu*