**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARI CARTAGENOVA, KEVIN MANSFIELD, and ABBY MUSICK on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOTDASH MEREDITH, INC.<br><br>*Defendant*. | Case No. 1:25-cv-11638<br><br>Hon. Nathaniel M. Gorton<br><br>**JURY TRIAL DEMANDED**<br><br>Leave to file granted on October 6, 2025 |

# PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

Defendant Dotdash Meredith, Inc.'s ("Meredith") Motion to Dismiss should be denied for multiple reasons. First, as to Defendant's personal jurisdiction argument, Defendant ignores that Defendant's proactive delivery of a digital newsletter to Plaintiffs Cartagenova's residence in Massachusetts. What's more, Defendant's own affidavits acknowledge that Defendant knows it is sending its digital newsletters to Ms. Cartagenova and other Massachusetts residents, because it is able to determine the location of the newsletter recipients through the unique IP address associated with their computer or mobile device. And the newsletters are more than just newsletters – they contain video content that plays automatically upon opening up an article in the newsletter. And it is the automatic playing of that video, sent directly to Ms. Cartagenova and other Massachusetts residents, that gives rise to Plaintiffs' claims for violation of the VPPA. Thus, this is not like the typical case where a user is attempting to establish jurisdiction simply by visiting the website of a company that otherwise has no connection to Massachusetts. Here, the Defendant's purposeful conduct of sending newsletters to Massachusetts residents directly

gives rise to the violations alleged in the Complaint. These allegations – which Defendant does not and cannot refute – satisfy both the Massachusetts long-arm statute and the requirements of due process. Accordingly, the Court has specific personal jurisdiction over Defendant.

Defendant's motion to dismiss for failure to state a claim fares no better, because Defendant ignores not only Plaintiffs' allegations, but also First Circuit law. Contrary to Defendant's arguments, Plaintiffs have adequately alleged they are "consumers" under the VPPA because they are "subscribers" to Defendant's services as that term has been interpreted by the First Circuit. Similarly, courts in this Circuit (and others) routinely find that the disclosure of information described in the Complaint constitutes disclosure of "personally identifiable information" under the VPPA. Accordingly, Defendant's Motion to Dismiss should be denied in its entirety.

## II. BACKGROUND

This is a consumer digital privacy class action complaint brought on behalf of all persons with Facebook accounts who have subscribed to newsletters from Entertainment Weekly and People, and interacted with videos on their respective websites (ew.com and people.com, collectively the "Websites"). The Websites are owned and operated by Defendant Meredith. Plaintiffs allege a single count for violations of the federal Video Protection Privacy Act ("VPPA"), which protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider", without express consent. 18 U.S.C. § 2710.

Dotdash Meredith is America's largest digital and print publisher, operating across multiple platforms–including print, digital, video, and social media–and reaching almost 200

million consumers every month through its portfolio of brands, including People, Entertainment Weekly, People en Español, Better Homes & Gardens, Verywell, Food & Wine, and Allrecipes. (ECF 1, ¶ 16.)

Video content has long been vital to these brands' digital strategy. (ECF 1, ¶ 20.) Consistent with this video-focused strategy, Dotdash Meredith's People and Entertainment Weekly brands deliver substantial video content to their users. Dotdash Meredith creates, hosts and delivers thousands of videos across the Websites relating to topics such as celebrity interviews, entertainment news segments, behind-the-scenes footage, and other original video programming. The videos are embedded alongside text articles, and the videos autoplay when users visit webpages and articles on the Websites. The scale of video delivery on the Websites is massive: as of January 2025, Entertainment Weekly reported 31 million monthly video views, and People reported 453 million video views. (ECF 1, ¶ 22.)

On the Websites, users can subscribe to various digital newsletters to receive the latest news and stories relating to topics addressed on each website. For example, on people.com, users can subscribe to any or all the following newsletters: "People News," "Royals," "True Crime," "People Shopping" and "People Style Watch." Similarly, ew.com users can sign up for newsletters including "EW Dispatch," "Entertainment Weekly," and "People News." Each newsletter is sent directly to the user's inbox and contains links to various articles on the respective website. Many of the linked articles feature video content that autoplays when the page loads. (ECF 1, ¶ 23.)

For both Websites, subscribing to any of these newsletters requires the user to provide their personal information to Meredith, including their email address. All newsletter subscribers also provide Defendant with their IP address, which is a unique number assigned to all

information technology connected devices, that informs Defendant as to subscribers' city, zip code and general physical location. Further, when users subscribe to newsletters, Meredith discloses this subscription to Facebook, along with the user's personally identifiable Facebook ID, or FID (if the user is logged into Facebook on their browser). (ECF 1, ¶ 24.)

Facebook collects vast amounts of data on its user through the use of the "c_user" cookie. (ECF 1, ¶¶ 28-29.) The extensive data collected enables Facebook to generate substantial advertising revenue by offering businesses the ability to target users with specific interests, retarget ads to users who visited their site without making a purchase, and analyze the types of Facebook users visiting their site by leveraging user demographics, interests, and behaviors on other websites. (ECF 1, ¶ 30.)

To access these services provided by Facebook, businesses like Meredith install the Facebook "pixel" on their websites. Also known as "web beacons," pixels are small, *invisible* images that a browser downloads like any other image on a website. The Facebooks pixel facilitates Facebook's tracking and data collection process, allowing Facebook to gather information about user behavior on the business's website and connect it to the user's Facebook profile using the c_user cookie and FID. (ECF 1, ¶ 31.)

When a user visits a web page containing the Facebook pixel, the pixel contacts the Facebook ad server. The pixel can be programmed by the business to send information to Facebook when users perform specific actions on the website, such as adding an item to their shopping cart, clicking a particular button, or watching a video. If the user has an active c_user cookie on their browser, Facebook receives the event information along with the user's FID, effectively linking the user's specific actions on the website to their Facebook profile. Without

the pixel installed, the user's actions on the website would not be communicated to Facebook. (ECF, ¶ 32.)

On an unknown date, but at least before April 2022, Dotdash Meredith installed Facebook pixel on the Websites and their individual pages. (ECF 1, ¶ 33.) Defendant configured the pixel on the Website to send specific data to Facebook when a user who is viewing a video interacts with the video by clicking on it, such as to pause the video, play the video, adjust the volume, or adjust the size of the video player. This data shared with Facebook includes the title of the video, the page's URL and the user's FID (i.e., the Personal Viewing Information). The transmitted data permits Facebook to identify the specific videos that a specific individual has watched. (ECF 1, ¶ 34.)

Plaintiffs are consumers who maintain Facebook accounts and subscribe to one or more newsletters published by the Websites. Mari Cartagenova resides in Massachusetts and has been a subscriber to an ew.com newsletter since 2024. (ECF 1, ¶ 47.) Plaintiff Kevin Mansfield is a resident of Rhode Island and has been a subscriber to an ew.com newsletter since 2022. (ECF 1, ¶ 52.) Plaintiff Abby Musick is a resident of Alabama and has been a subscriber to a people.com newsletter and to People Magazine. (ECF 1, ¶ 57.) Each has viewed videos on the respective Websites.

When Plaintiffs viewed videos on the Websites, either directly or by clicking on a link provided in the digital newsletter Defendant delivered to their email inbox, Meredith collected and shared with Facebook their Personal Viewing Information, along with their personally identifiable information ("PII") in the form of their FID and IP address. (ECF 1, ¶ 38.) Defendant did not obtain Plaintiffs' consent prior to disclosing their Personal Viewing Information to Facebook. (ECF 1, ¶ 39.) In so doing, Defendant knowingly and intentionally violated the VPPA.

## III. ARGUMENT

### A. This Court Has Specific Jurisdiction Over Defendant

#### *1. The Massachusetts Long Arm Statute Authorizes Jurisdiction Over Defendant*

The Massachusetts long arm statute, Mass. Gen. Laws. Ch. 223A, § 3, provides two independent bases for jurisdiction here, authorizing the Court's exercise of jurisdiction "over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; [or] (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent court of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth."

##### *a. Section 3(a) – "Transacting Business"*

With respect to Section 3(a) the definition of "transacting" is construed broadly under Massachusetts law. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992) ("Both federal and state courts have regularly construed the 'transacting any business' language of the statute in a generous manner."); *Diamond Group, Inc. v. Selective Distribution Int'l, Inc.*, 998 N.E.2d 1018, 1022 (Mass. 2013) ("We interpret ["any" in the statute] to be expansive, or to mean that the volume of business need not be substantial but merely definite and perceptible."). The test for this determination is whether the defendant attempted to participate in the Commonwealth's economic life and whether the transacted business was a "but for" cause of the harm. *See Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015)*.

Under Section 3(a), the "arising from" requirement must also be met. "[A] claim arises from a defendant's transaction of business in the forum State if the claim was made possible by,

or lies in the wake of, the transaction of business in the forum State." *Tatro v. Manor Care, Inc.*, 625 N.E.2d 549, 553 (Mass. 1994). This inquiry is a "but for" causation test which asks "[d]id the defendant's contacts with the Commonwealth constitute 'the first step in a train of events that result[ed] in the personal injury.'" *Lyle Richards Int'l, Ltd. v. Ashworth, Inc.*, 132 F.3d 111, 114 (1st Cir. 1997) (quoting *Tatro*, 625 N.E.2d at 553). The standard is not rigorous. *See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 n.3 (1st Cir. 2016).

Defendant readily admits that it transacts business in Massachusetts; indeed, it expressly admits that it knows the precise percentage of its website users who reside in Massachusetts. (*See, generally*, ECF 19 & 20.) Nonetheless, Defendant attempts to avoid application of Section 3(a) by likening this case to those in which a defendant merely operates a website that is accessed by Massachusetts residents, arguing that "Plaintiffs' claims are premised on the alleged violation of the VPPA through the Websites." (ECF 21 at 7.) This argument, however, ignores the specific allegations in the Complaint alleging that Defendant purposefully sends digital newsletters to consumers that Defendant knows live in Massachusetts. (ECF 1, ¶¶ 23-25.)

Defendant's argument also ignores that Plaintiffs' subscription to these newsletters is a direct "but-for" causation of Defendant privacy violation. As described in the Complaint, "Each newsletter is sent directly to the user's inbox and contains links to various articles on the respective Website. ***Many of the linked articles feature video content that autoplays when the page loads.***" (ECF 1, ¶ 23 (emphasis added.) And as described elsewhere in the Complaint, when a Massachusetts newsletter subscriber like Ms. Cartagenova watches a video, Defendant transmits not only the name of the video, but also Ms. Cartagenova's personally identifiable information to Facebook via the pixel. (*See, e.g.,* ECF 1, ¶¶ 33-39.)

Thus, Defendant's contention that it merely "offers websites accessible in Massachusetts" is not true. Defendant sends its newsletters – purposefully and knowingly – to Massachusetts residents, and thereby entices them to watch the videos that results in a VPPA violation.

Defendant's heavy reliance on *Frawley v. Nexstar Media Group, Inc.*, 2023 WL 6065768 (D. Mass. Sept. 18, 2023) does not save its argument. In *Frawley*, unlike this case, there were no allegations that tied the knowing and purposeful delivery of a newsletter to the alleged VPPA violations. Defendant attempts to sidestep this critical distinction by noting that the plaintiff in that case "received a free email newsletter from" the defendant. While true, the court's opinion makes clear that unlike in this case, where there are specific allegations tying the delivery of the newsletter to the viewing of the videos and resulting VPPA violations, the plaintiff's claims arose solely from the plaintiff's viewing of videos on the website. *Id.* at *2. Stated another way, Defendant in this case triggers the VPPA violations by sending its newsletters to Massachusetts residents, there were no such allegations in *Frawley*. Indeed, Defendant acknowledges this key point, noting the *Frawley* courts finding that "the defendant's only relevant presence in Massachusetts here is the availability of the website …" (ECF 21 at 9.)

This case is different. Defendant purposefully and knowingly sends its newsletters to Massachusetts residents like Ms. Cartagenova. Those residents click on a link from their email inbox that was sent by Defendant, and a VPPA violation occurs. As such, "[D]efendant's contacts with the Commonwealth" – i.e., Defendant's knowing and purposeful transmission of the newsletter – "constitutes 'the first step in a train of events that result[ed] in the personal injury.'" *Lyle Richards*, 132 F.3d at 114. Accordingly, the long arm statute is satisfied.

*b. Section 3(d) – "Causing Tortious Injury while Regularly Soliciting Business"*

Defendant is also subject to jurisdiction under Section 3(d). Defendant argues that Section 3(d) only applies "only if general jurisdiction exists" over the Defendant. ECF 21 at 10. But this argument proves too much. As Defendant candidly notes, Judge Burroughs found Defendant subject to Section 3(d) – and thus found Defendant to general jurisdiction – just last year. *Rancourt v. Meredith Corp.*, 2024 WL 381344 (D. Mass. Feb. 1, 2024). In *Rancourt*, the court found Section 3(d) applicable on remarkably similar facts: In that case, ads run in Massachusetts on the subject mobile app accounted for roughly 2% of Meredith's total revenue from the app, *id.* at *3; in this case, Meredith admits to deriving roughly 2% of its overall revenue from Massachusetts. (ECF 19, ¶ 8.). In *Rancourt*, approximately 3% of the subject app's users were located in Massachusetts, *id.*; in this case, Meredith admits that approximately 3% of the visitors to ew.com and people.com are located in Massachusetts. (ECF 20, ¶¶ 15-16.)

Defendant offers no plausible argument as to why virtually identical percentages of revenue and users was sufficient to satisfy Section 3(d) in *Rancourt* but is not sufficient here. Instead, Defendant focuses on the inclusion of geolocation data on the subject app in *Rancourt* as distinguishing factor, but it is not. To the contrary, *Rancourt* focused not on the existence of geolocation data – which, in any event, is indistinguishable from the location data obtained from an IP address for these purposes – but rather on the fact that Meredith derived 2% of its revenue from the subject app from Massachusetts users. *Id.* at *6. The same analysis applies here.

*2. Specific Jurisdiction Over Defendant Comports with Due Process*

"Where the defendant is not subject to general jurisdiction, due process may still permit a district court to exercise specific jurisdiction." *Venmill Indus., Inc. v. ELM, Inc.*, 100 F. Supp. 3d 59, 67 (D. Mass. 2015). "Specific personal jurisdiction ... may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'"

*Warren Envtl., Inc. v. Source One Envtl., Ltd.*, 2020 WL 1974256, at *3 (D. Mass. Apr. 24, 2020) (quoting *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994)). "The three elements of specific jurisdiction are relatedness (the nexus of plaintiff's claim with the defendant's contact with the forum), purposeful availment (something more than an isolated contact or the unilateral activity of a third person), and the reasonableness of the exercise of jurisdiction (the five Gestalt factors)." *Id.* (citing *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 35 (1st Cir. 2016)). An affirmative finding as to all three is required before a court can exercise specific jurisdiction. *Phillips Exeter Academy v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir. 1999). That said, "[i]n cases involving interactions through a website that is operated from outside the forum state but that residents in that state can access, the focus of this analysis has been on the 'purposeful availment' requirement." *Sun Life Assur. of Canada v. Sun Bancorp, Inc.*, 946 F. Supp. 2d 182, 190 (D. Mass. 2012).

*a. <u>Defendant Purposefully Availed Itself of the Privilege of Conducting Activities in Massachusetts</u>*

To satisfy the purposeful availment requirement, a plaintiff must demonstrate that the defendant's in-state contacts represent a "purposeful availment of the privilege of conducting activities in the forum state" such that any contacts with it are foreseeable and voluntary rather than "random, isolated, or fortuitous[.]" *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 59–60 (1st Cir. 2016) (internal quotation marks and citation omitted). To assess purposeful availment, "the court looks to the 'two key focal points' of voluntariness and foreseeability." *Frawley*, 2023 WL 6065768 at *5 (quoting *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 257 (1st Cir. 2022)).

Here, both voluntariness and foreseeability are satisfied. There is no question but that Defendant's conduct giving rise to Plaintiffs' claims – i.e., sending a newsletter that entices a VPPA violation – is done voluntarily by Defendant. No one makes Defendant send a newsletter

to Massachusetts residents, nor does anyone force Defendant to populate that newsletter with links that trigger a VPPA violation. This is in sharp contrast to Defendant's cited cases such as *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 57 (1st Cir. 2020), in which the court expressly noted that the defendant had not "aimed" its website at Massachusetts residents. Here, Defendant unquestionably "aimed" its newsletters at Massachusetts residents, including Ms. Cartagenova.

Regarding foreseeability, *Rancourt* is again instructive. Rejecting the same arguments advanced by Meredith in this case, Judge Burroughs again noted the substantial revenue that Meredith had received from Massachusetts residents, holding that "Meredith is not merely aware of its many Massachusetts users and the resulting ad revenue, but it also uses the information it collects to tailor advertisements and content to increase user engagement" – findings that are echoed in the Complaint's allegations explaining how Meredith and Facebook compile user data to build profiles on their users and target their advertising, thereby increasing their revenue. (ECF 1, ¶¶ 35-38.) Notably, and contrary to Defendant's argument that it merely offers a website for nationwide access, *Rancourt* noted that Defendant's use of user data to build profiles and target advertising is "far from being indifferent to geography." *Id.* at *9 (quoting *UMG Recordings, Inc. v. Kurbanov*, 63 F.3d 344, 353 (4th Cir. 2020) and citing *Doffing v. Meta Platforms, Inc.*, 2022 WL 3357698, at *4 (D. Or. July 20, 2022) and *Alston v. www.calculator.com*, 476 F. Supp. 3d 1295, 1315 (S.D. Fla. 2020)).

*b. Relatedness and Reasonableness Are Satisfied*

For the same reasons, Defendant's contacts with Massachusetts are directly related to the VPPA violations alleged. Defendant sent digital newsletters to Massachusetts residents, including Ms. Cartagenova. Defendant certainly expected that Massachusetts would click on the

links included in the newsletter, as Ms. Cartagenova did. Upon clicking on a link, a video would play, and Massachusetts residents' personally identifiable information would be transmitted by Defendant to Facebook. Thus, contrary to Defendant's argument, there is plainly a demonstrable nexus between Defendant's contacts and the resulting VPPA violation.

Finally, Defendant's claims that it is unreasonable for it to defend a lawsuit in Massachusetts is specious. Defendant is a large corporation that admittedly has 3,100 U.S.-based employees, two dozen of which are based in Massachusetts. It offers no evidence to suggest that it cannot defend itself in a Massachusetts courtroom, because no such evidence exists.

For each of the foregoing reasons, Defendants motion to dismiss for lack of personal jurisdiction should be denied.

**B. Plaintiffs have Adequately and Plausibly Alleged a VPPA Claim**

*1. Plaintiffs have Alleged they are "Consumers" Under the VPPA*

Defendant's first argument is that Plaintiffs are not "consumers" under the statutory definition, which define the term as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2701(a)(1). In particular, Defendants argues that Plaintiffs are not "subscribers" because "[i]f every person who subscribes to a free newsletter is a consumer of a videotape service … the word 'subscriber' in the statute is stripped of all meaning." ECF 21 at 15. The problem with this argument is that the First Circuit has held that a subscriber to a free newsletter is, in fact, a "subscriber" and thus a "consumer" under the VPPA. *Yershov v. Gannett Satellite Information Network, Inc.* 820 F.3d 482, 487-88 (1st Cir. 2016). Expressly rejecting Defendant's argument that a recipient of a free newsletter could not be a subscriber, the court noted "that if the term 'subscriber' required some sort of monetary payment, it would be rendered superfluous by the two terms preceding it." *Id.* at 487.

Defendant attempts to distinguish *Yershov* by once again ignoring Plaintiffs' allegations, arguing that there is no allegation that "the newsletters themselves provided access to or linked to video content." (ECF 21 at 15.) This is simply not true: the Complaint specifically alleges that "[e]ach newsletter is sent directly to the user's inbox and contains links to various articles," many of which "feature video content that autoplays when the page loads." (ECF, ¶ 23.) And even Defendant is forced to admit that the key aspect of *Yershov's* holding is that "access was not free of a commitment to provide consideration. …" (ECF 21 at 15, quoting *Yershov*, 820 F.3d at 489.) But Defendant's ellipsis leaves out *Yershov's* description of that "consideration": the plaintiff's "personal information … which was of value to" the defendant." *Yershov*, 820 F.3d at 489. Plaintiffs here, of course, also provided personal information in the form of IP addresses and email addresses when they subscribed to the newsletters. (ECF 1, ¶ 24.) And as in *Yershov*, this and other information – including the title of the video – was collected by Meredith and shared with Facebook every time a video played.

Defendant devotes much space to its argument to citing cases from other Circuits, quietly acknowledging that "there is a Circuit split with regard to the interpretation of 'consumer' under the VPPA." (ECF 21 at 16 n. 6.) What Defendant doesn't say is that the cases it cites are on the other side of the split from the First Circuit's interpretation as expressed in *Yershov*. Needless to say, this Court is bound to follow the First Circuit's interpretation, not those of other Circuits. Accordingly, Defendant's citation to those cases is inapposite and irrelevant to this Court's consideration of Defendant's motion.

2. *<u>Plaintiffs have Alleged that Meredith Disclosed Their PII</u>*

Defendant correctly notes the First Circuit has adopted a "reasonably and foreseeably likely" standard to determine whether a defendant has disclosed PII in violation of VPPA. In

*Yershov*, the First Circuit found that such disclosure occurred based on allegations that the defendant disclosed the title of the video, location data such as an IP address, and unique identifiers associated with the user's device – in *Yershov*, it was the user's Android ID; here, it is the user's Facebook ID. *Yershov*, 420 F3d at 484.

Defendant's once again note that Plaintiffs' allegations might be deemed insufficient in other Circuits, which have adopted a different standard than the First Circuit's "reasonably and foreseeably likely" standard. But we are not in another Circuit, and this Court is obligated to file First Circuit precedent notwithstanding different interpretations in other jurisdictions.

Because it cannot argue that Plaintiffs have not adequately alleged the disclosure of PII under this Circuit's law, Defendant turns to a hodgepodge of other arguments while once again ignoring that Plaintiffs allegations in this case adequately and plausibly state a claim in this Circuit. These arguments are addressed in turn below.

*a. Plaintiffs Obtained Videos Whether they Requested Them or Not*

Defendant first focuses on the VPPA requirement that the consumer "requested or obtained" the videos. Incongruously, however, Defendant then proceeds to argue that the requirement is conjunctive rather than disjunctive, asserting that because Plaintiffs did not "request" autoplayed videos they could not have "obtained" them. "Obtain" and "request" are different words, and they mean different things. Specifically, "obtain" means "to come into possession of." Webster's Encyclopedic Dictionary (1996). When a consumer clicks on a link that autoplays a video on their computer or mobile device, this certainly qualifies as "obtaining" the video according to the dictionary definition. Moreover, while Plaintiffs did experience autoplayed videos, the Complaint's allegations are not exclusive to autoplays; rather, the allegations provide that each Plaintiff "periodically watched" videos on the subject websites.

(ECF 1, ¶¶ 49, 54, 59.) Thus, while Plaintiffs were exposed to autoplayed videos that they "obtained," the Complaint's allegations are broad enough to encompass videos they both "requested" and "obtained."

*b. Plaintiffs have Alleged that the Defendant Transmitted their PII to Facebook*

As a variation on the same theme, Defendant highlights the Complaint's allegation that information is shared when a user "interacts" with a video. According to Defendant's selective reading of Plaintiffs' allegations, this means that Plaintiffs – who Defendant says only viewed "autoplayed" videos – never "interacted" with a video, and thus their information was never shared with Facebook. But again, the Complaint's allegations encompass more than autoplayed videos, but also videos that Plaintiffs themselves clicked on and viewed. Moreover, the Complaint expressly alleges that the information was shared whenever a video was "played." The Complaint makes no distinction between a user clicking "play" and a video that begins playing automatically, because there is none – in either case, the user's information is shared with Facebook in violation of the VPPA.

*c. Plaintiffs have Plausibly Alleged Disclosure of Specific Videos*

Defendant next confusingly argues that the transmission of the "title" of the video to Facebook somehow does not constitute transmission of the title of the video to Facebook. Plaintiff has alleged that the verbiage following the word "title" is the title of the video. This allegation, which is taken as true for purposes of a motion to dismiss, plausibly alleges that Defendant disclosed the title of the video to Facebook. Defendant's arguments to the contrary – that the "title" might not really be the "title," or that Facebook might not have understood it to the "title" – are beside the point. The statute – and the First Circuit law interpreting it – does not require that the recipient of the disclosure "understand" what the disclosure means. *Yershov*, 820

F.3d at 486 (disclosure is actionable if it is "reasonably and foreseeably likely to reveal which … videos [the plaintiff] has obtained"); *see also Belozerov v. Gannett Co., Inc.*, 646 F. Supp. 3d 310, 314-15 (D. Mass. 2022) (accepting factual allegations as true that defendant disclosed PII to Facebook); *cf. Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 49-50 (2nd Cir. 2025) (differing from *Yershov* by adopting a "ordinary person" standard pursuant to which information transmitted by Facebook pixel was not actionable).

Defendant wrongly argues that *Yershov* requires that the disclosure "must *reveal*" which videos a person has obtained. (ECF 21 at 19.) As noted above, however, that is not what *Yershov* says – the standard is whether it is "reasonably and foreseeably likely to reveal" the video content. Here, Plaintiffs have plausibly alleged that Defendant transmits to Facebook code which identifies the "title" of the video. Moreover, the Complaint makes clear that Facebook knows exactly what information it is receiving through its pixel, because it uses that data to build its user profiles and target its ads. (ECF 1, ¶¶ 30-32.) Under *Yershov*, these allegations are more than sufficient to plausibly allege the disclosure of video content obtained or requested by Plaintiffs.

*d. Plaintiffs have Plausibly Alleged Disclosure of Identifying Information*

Defendant's last argument is not surprisingly its most specious, arguing that because Plaintiffs did not specifically allege that their Facebook accounts use their real names, they have failed to allege that the disclosure of their Facebook ID constitutes disclosure of personally identifiable information. The Complaint is replete, however, with allegations that by disclosing the video titles with Plaintiffs' Facebook IDs, Defendant has disclosed sufficient information to identify Plaintiffs – the reasonable inference being that Plaintiffs, like most people, do not maintain anonymous or pseudonymous Facebook accounts. And in any event, "A Facebook ID is a unique identifier that allows anyone to discovery the user's identity," and "courts in other

circuits have explicitly held that a Facebook ID constitutes PII." *Belozerov*, 646 F. Supp. 3d at 314 (citing *Czarnionka v. Epoch Time Ass'n, Inc.*, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022) and *Lebakken v. WebMD LLC*, 640 F. Supp. 3d 1335 (N.D. Ga. 2022)).

At bottom, each of Defendant's arguments is wholly lacking in merit. Under the binding law of the First Circuit, Plaintiffs are "consumers" within the definition of the VPPA, and Defendant violated the VPPA by disclosing their video content and PII without consent. Accordingly, Defendant's motion to dismiss should be denied in its entirety.

## IV. CONCLUSION

For each of the reasons set forth above, Plaintiffs request that the Court enter an order denying Defendant's Motion to Dismiss in its entirety, and awarding Plaintiffs such further relief the Court deems just and proper. In the alternative, to the extent the Court deems Plaintiifs' allegations deficient in any way, Plaintiffs respectfully request leave to amend the Complaint in accordance with the Court's ruling."

DATED: October 6, 2025

Respectfully submitted,

Mari Cartagenova, Kevin Mansfield, and Abby Musick

By: /s/ Thomas M. Hanson
*One of Plaintiffs' Attorneys*

Mark Loevy-Reyes, BBO No. 707974
Thomas M. Hanson*
Loevy + Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902
hanson@loevy.com
*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I, Thomas M. Hanson, an attorney, hereby certify that on October 6, 2025, the foregoing document was filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ *Thomas M. Hanson*
Thomas M. Hanson