**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARI CARTAGENOVA, KEVIN MANSFIELD, AND ABBY MUSICK on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DOTDASH MEREDITH, INC.<br><br>Defendant. | Case No. 1:25-cv-11638-NMG<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**Leave for Reply Granted: October 10, 2025 (Dkt. No. 30)** |

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO DISMISS**

Plaintiffs' opposition confirms this case does not belong in Massachusetts and does not belong in court at all. Unable to tether their claims to any Massachusetts conduct, Plaintiffs try to amend their Complaint by brief—asserting for the first time that a Massachusetts Plaintiff clicked newsletter links that opened web articles with autoplaying videos. That allegation appears nowhere in the Complaint. And even if it did, it would not create jurisdiction: the alleged VPPA violation arises, if at all, from code on nationally accessible webpages, not from the act of sending or receiving a nationwide newsletter. Indeed, finding jurisdiction here would mean jurisdiction could be found anywhere the *EW* and *People* Websites could be accessed.

The same pleading gaps doom Plaintiffs' claim on the merits. Plaintiffs are not "consumers" because they merely signed up for newsletters that are unconnected to video access. Instead, they are website browsers who allege they watched autoplaying videos embedded in articles on the Websites. Nor have they plausibly alleged the disclosure of information foreseeably likely to reveal the specific videos they requested or obtained and their identity—in fact, they have not plausibly alleged that any disclosure as to them occurred at all. The allegations in the Complaint therefore fall far outside the scope of this 1989 statute and the Court should dismiss the Complaint with prejudice.

## ARGUMENT

### I. Plaintiffs Have Not Established Specific Jurisdiction Over DDM

Plaintiffs' jurisdictional theory rests on a tenuous chain of purported events: (i) DDM sends free, national newsletters that anyone can sign up to receive; (ii) recipients in Massachusetts may click links in the newsletters; (iii) the links open webpages to articles; (iv) videos embedded on the pages autoplay; and (v) pixel code on the webpages violates the VPPA.

As an initial matter, Plaintiffs never pled that any Plaintiff accessed a video *from the newsletter*. They never allege they watched a video embedded in an article accessible from a newsletter they received and opened, let alone that they clicked a link in a newsletter. Nor do they allege that any video they viewed was accessible through an article link in a newsletter, or that all articles on the Websites are even linked in newsletters. The Complaint alleges only that Plaintiffs received unnamed newsletters and, separately, watched unnamed videos on publicly accessible webpages. (Compl. ¶¶ 49, 54, 59.) Plaintiffs' brief tries to rewrite those allegations, claiming for the first time that the alleged VPPA violations stem from clicking a link in the newsletter. For example, Plaintiffs *now* claim:

- "When Plaintiffs viewed videos on the Websites, either directly or by clicking on a link provided in the digital newsletter Defendant delivered to their email inbox . . . ." (Resp. at 5);
- "[T[here are specific allegations tying the delivery of the newsletter to the viewing of videos . . . . These residents click on a link from their email inbox that was sent by Defendant, and a VPPA violation occurs." (Resp. at 8);
- "Defendant certainly expected that Massachusetts [sic] would click on the links included in the newsletter, as Ms. Cartagenova did." (Resp. at 11–12).

Regardless, even if Plaintiffs had pled all of what they now claim they did, the attenuated sequence of events of clicking a link in a newsletter that leads to an article on a public webpage cannot satisfy either the Massachusetts long-arm statute or due process.

**A. The Long-Arm Statute Does Not Authorize Jurisdiction Over DDM**

1. Plaintiffs cannot demonstrate causation under 3(a) of the Long Arm Statute

Section 3(a) of the Massachusetts long-arm statute requires that Plaintiffs' claims "arise from" DDM's transaction of business here based on a "but for" causation test. Mass. Gen. Laws ch. 223A, §3 ("Long-Arm Statute"); *Frawley v. Nexstar Media Grp., Inc.*, 2023 WL 6065768, at *4 (D. Mass. Sept. 18, 2023). Plaintiffs' claim arises, if at all, from alleged website pixel activity, not from newsletters. The alleged VPPA injury occurs only when pixel code on a publicly accessible webpage transmits data as a result of on-page activity. (*See* Compl. ¶ 32). But that transmission would occur regardless of the user's path to the page (typing the URL, clicking a search or social link, or, as Plaintiffs *now* posit, clicking a newsletter link). A free, nationwide email that simply references universally-available webpages is not the "but for" cause of a website-based injury; at most, it is an incidental conduit untethered to the alleged wrongful act.

The Complaint underscores the point. It alleges only that Plaintiffs signed up for newsletters and, separately, watched videos on publicly accessible webpages. Plaintiffs' brief tries to rewrite those allegations, but, of course, a complaint cannot be amended by opposition.[1] Even if the lone Massachusetts Plaintiff had clicked on an article link in a newsletter and watched a video, that still would not transform DDM's non-targeted, cost-free newsletter into the legally cognizable cause of a pixel transmission on a website. As this Court has recognized, "isolated transactions unaccompanied by 'purposeful intent' on the part of [a] defendant[ ] and having only a 'slight effect on the commerce of the Commonwealth' are not enough to support jurisdiction." *Frawley*, 2023 WL 6065768, at *4 (internal citation omitted); *Reagent Fund II, LP*

[1] *See, e.g.*, *Willitts v. Life Ins. Co. of N. Am.*, 2021 WL 735784, at *4 (D. Mass. Feb. 25, 2021) ("an opposition to a motion to dismiss is not the place for new factual allegations"); *Miller v. Suffolk Cnty. House of Corr.,* 2002 WL 31194866, at *2 n.1 (D. Mass. Sept. 27, 2002) (declining to consider new allegation presented in opposition to motion to dismiss and collecting cases).

*v. Lotus Gunworks of S. Fla., LLC*, 687 F. Supp. 3d 169, 174–75 (D. Mass. 2023); *Power v. Connectweb Techs., Inc.*, 648 F.Supp.3d 321, 332 (D. Mass. 2023). Additionally, "the 'Defendant's awareness of the location of the plaintiff [in the Commonwealth] is not, on its own, enough to create personal jurisdiction over a defendant.'" *Power*, 648 F.Supp.3d at 332. Thus, even if DDM had the ability to determine the browser location of an individual when he or she signs up for the newsletter (through an IP address or otherwise), it is not enough for purposes of Section 3(a).

Granting Plaintiffs leave to amend their Complaint would not satisfy these fatal flaws. Just as the court noted in *Frawley*, Plaintiffs here "do[ ] not make any assertion that [DDM] actively solicited Massachusetts citizens more than citizens of any other state. [Nor] that they actively solicited Massachusetts residents to sign up for the newsletter[s] at issue here." 2023 WL 6065768, at *4. DDM's "only relevant presence . . . here is the availability of the website[s], which is insufficient, without more, to constitute 'transacting business' [under 3(a)]." *Id.*

2. Plaintiffs cannot demonstrate DDM caused tortious injury while regularly soliciting business in Massachusetts under Section 3(d)

Section 3(d) fares no better. Plaintiffs inexplicably abandon their previous focus on DDM's newsletters and instead highlight DDM's *overall* revenue from Massachusetts. In doing so, Plaintiffs' reliance on *Rancourt v. Meredith*, 2024 WL 381344 (D. Mass. Feb. 1, 2024), is misplaced. There, the defendant allegedly operated a GPS-enabled mobile app installed on devices in Massachusetts, targeted ads to those devices based on precise geolocation, and tracked and monetized Massachusetts-specific usage—with concrete revenue tied to in-state devices. *Id.* at *1. The court determined that because the defendant "received $70,000 in ad revenue from devices located in Massachusetts over two years" based on the function of the mobile app, this was enough under Section 3(d). *Id.* at *6.

None of that is alleged here. Plaintiffs have not (and cannot) point to how DDM has generated revenue from Massachusetts-specific individuals through DDM's Websites or through its complimentary newsletters. Further, there are no allegations that *People* or *EW* specifically target residents in a particular area, as the defendant allegedly did with the geolocation capabilities in the Allrecipes app at issue in *Rancourt*.[2] Plaintiffs' reliance on generalized, low-single-digit percentages of traffic or revenue does not establish regular solicitation or a "persistent course of conduct" in Massachusetts tied to the claimed injury—particularly where, as here, the newsletters and Websites are universally accessible. Jurisdiction is therefore not proper.

**B. The Court's Exercise of Specific Jurisdiction Over DDM Would Offend Due Process**

Even if Plaintiffs could demonstrate that jurisdiction is authorized under the Long-Arm Statute, which they cannot, haling DDM into court here would offend due process. DDM has not purposefully availed itself of jurisdiction in Massachusetts, and Plaintiffs cannot satisfy the "relatedness" and "reasonableness" requirements.

1. <u>Plaintiffs cannot show that DDM purposefully availed itself of Massachusetts</u>

Plaintiffs correctly note that DDM's contacts must be voluntary and foreseeable, meaning they must be sufficient to give DDM notice of potentially being haled into court. *Frawley*, 2023 WL 6065768, at *5. Neither requirement is satisfied here because DDM's connections to

---

[2] Plaintiff implies the *Rancourt* defendant is the same as Defendant here (Resp. at 9), but Allrecipes' operations, assets, and liabilities are held by a DDM subsidiary that is separate from the subsidiary that holds *People* and *EW*'s operations, assets, and liabilities. (Dkt. No. 19, ¶ 5.) The presumption of corporate separateness applies and "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary." *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 139 (1st Cir. 2006) (internal citation omitted); *see also Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir.1990) (institutional independence of parent and subsidiary presumed when jurisdiction would be solely based on subsidiary's contacts with forum).

Massachusetts are nothing more than "random, fortuitous, or attenuated." *Id*. (citing *Cossaboon v. Maine Med. Ctr.*, 600 F.3d 25, 32 (1st Cir. 2010)). The only relevant "contact" is that the Websites and newsletters can be accessed from Massachusetts.

Plaintiffs summarily claim that because DDM *voluntarily* sends newsletters to Massachusetts residents who sign up for them, the voluntariness requirement is satisfied. (Resp. at 10.) But that gets the standard backwards: voluntariness turns on DDM's *own* deliberate, forum-directed conduct, not Massachusetts residents' unilateral decision to opt in to a newsletter and click links that lead to universally accessible webpages. A nationwide, untailored newsletter program—sent from outside the forum and triggered by user sign-ups—does not reflect purposeful availment of this forum.

Plaintiffs also try to satisfy foreseeability by invoking *Rancourt*, but that case involved targeted, in-state conduct: a GPS-enabled mobile app that delivered ads to devices located in Massachusetts and monetized those Massachusetts interactions, leading the court to conclude that it was foreseeable that the defendant could be haled into court here for an alleged in-app VPPA violation. Here, by contrast, the alleged violation is tied to nationally accessible webpages, not to newsletters, and Plaintiffs identify no Massachusetts-focused website activity by DDM that gave rise to their claim. In fact, any visibility into a recipient's general location based on their IP address is both user-action dependent (based on opening and clicking a newsletter), and, unlike GPS coordinates, highly imprecise and variable (based on VPNs or other tools), further undermining Plaintiffs' foreseeability claims. (*See* Dkt. No. 20, Brez Decl. ¶¶ 20–21.) A claim "must directly arise from or relate to the defendant's activities in the forum," *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 122 (1st Cir. 2022), and "aside from its operation of a website that can be found from anywhere online," "[n]othing in [Plaintiffs']

Complaint [or Response] describes efforts to target Massachusetts or significant revenue [DDM] raises from its Massachusetts contacts." *Frawley*, 2023 WL 6065768, at *6.

2. Plaintiffs cannot satisfy the relatedness and reasonableness requirements

Plaintiffs "relatedness" showing likewise fails. The alleged injury—pixel transmissions from publicly accessible webpages—does not arise from any Massachusetts-focused activity. Though no individual Plaintiff alleges he or she watched an autoplaying video by clicking on an article link in a newsletter while in Massachusetts, even if they did, that is not enough to show the "'demonstrable nexus' between the claims of the plaintiff and the defendant's contacts in the forum state." *Motus*, *LLC*, 520 F.Supp.3d at 91 (internal citation omitted).

Further, the Court should reject Plaintiffs' claim that it would be reasonable to pull DDM into court here. (Resp. at 11–12.) Hauling a New York-headquartered Delaware corporation into a Massachusetts forum over borderless web activity is not reasonable. Plaintiffs point to DDM's "two dozen" employees based here (Resp. at 12), but none of them control what data is collected by the Websites and allegedly shared. (Dkt. No. 19, ¶ 7.) Jurisdiction here does not comport with due process.

## II. The Complaint Fails To State a Claim Under the VPPA

### A. Plaintiffs Are Not Consumers Under the VPPA; They Are Website Surfers

To qualify as a "consumer," a plaintiff must be a "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. 2710(a)(1). Plaintiffs allege only that they signed up for free email newsletters—communications that are not necessary to view videos on the Websites, which are open to all.

Plaintiffs argue that *Yershov v. Gannett Satellite Information Network, Inc.* 820 F.3d 482 (1st Cir. 2016), held that a subscriber to a free newsletter is a consumer under the VPPA. (Resp. at 12.) Not so. There was no newsletter in that case, and the court did not hold that a plaintiff

who accessed a video completely separately from a newsletter is a consumer. In fact, Plaintiffs' casual, untethered email sign-up is worlds apart from the app-based access in *Yershov*, where the First Circuit limited its holding to a transaction in which the plaintiff used an app to access videos and, in exchange, provided device identifiers and precise GPS data through that channel. 820 F.3d at 489. Plaintiffs' reliance on *Yershov* misreads the case: the First Circuit did not treat "free" status as dispositive; it focused on the app subscription as the gateway to video access and the contemporaneous exchange of device identifiers and precise location data through that same channel. *Id*. at 487–489. DDM's argument here likewise does not depend on price; it turns on the absence of any nexus between Plaintiffs' email sign-up and access to video materials. Plaintiffs effectively acknowledge that disconnect, which is why their Response labors to retrofit the Complaint with new assertions tying newsletter clicks to video viewing. But the Complaint's allegations control, and, in any event, the same videos are available to anyone, newsletter recipient or not, so newsletter sign-up says nothing about access. Reading the term "subscriber" to encompass any unrelated email sign-up for an articles-only newsletter would swallow the statute and detach liability from the video-consumption context Congress targeted. *See, e.g.*, *Salazar v. Paramount*, F.4th 642, 651–53 (6th Cir. 2025) (construing "consumer" in context).

**B. Plaintiffs Did Not Obtain or Request Videos and Do Not Allege Any Disclosure**

Plaintiffs do not plausibly allege that they "requested or obtained" specific videos. Plaintiff's own pleading admits that the Websites' videos autoplay upon page load. But passive exposure to an embedded autoplay clip is not deliberately "requesting" or "obtaining" as the VPPA contemplates.[3] One is not obtaining (and certainly not requesting) a video when one goes to a website and a video is playing, exposing the reader to the video. Plaintiffs' allegations that

[3] When the Plaintiffs state in their Response that a user clicks on a link to auto play a video, Plaintiffs mean that the user is clicking on a link to an article, not a video directly. Plaintiffs concede that the user is then "exposed to" or "experience[d]" the videos. (Resp. at 14-15.)

they "periodically watched" videos do not mean they "requested" or "obtained" the videos either, given their further allegation that videos autoplay on the Websites. (Compl. ¶ 22.) The statute aimed to safeguard a consumer's video *choices* (Dkt. No. 21 at 23), not incidental background video that happens to play when a user reads an article. Finding that Plaintiffs "requested or obtained" videos here is akin to finding someone "requested or obtained" the movie *A Few Good Men* from Blockbuster simply because, in 1993, it was playing on in-store televisions as the person walked in.

Plaintiffs also do not plausibly allege that the triggering condition for any disclosure occurred as to them. They allege disclosure occurs *only* when a user "interacts" with a video—by playing, pausing, adjusting volume, or resizing. (Compl. ¶ 43 ("Defendant configured the pixel on the Website to send specified data to Facebook when a user who is viewing the video *interacts with the video* by clicking on it, such as to pause the video, play the video, adjust the volume, or adjust the size of the video player.") (emphasis added).) None of the Plaintiffs alleges taking such action. They claim only that they "periodically watched" videos on the Websites, and in their Response, try to broaden that to include "videos Plaintiffs themselves clicked and viewed." *Id.* But again, Plaintiffs are trying to amend their pleading by brief, as there are no allegations that Plaintiffs ever interacted with a video, and Plaintiffs point to none. Under their own pleading, merely "watching" autoplay videos does not suffice to plead a disclosure.

### C. Plaintiffs Have Not Alleged Disclosure of Specific Video Materials

Plaintiffs do not plausibly allege that the alleged transmission identified specific videos. Plaintiffs point to a single screenshot from a People.com article (not tied to any particular Plaintiff) and infer that a field prefaced by "cd[pageFeatures]" contains the video's title, and Facebook receives and understands it as such. The Complaint alleges neither that DDM programmed that field to represent a video title rather than, for example, an alternate page title,

nor that Facebook interprets it as a video title. Plaintiffs' fallback—that Facebook uses the data from pixels to build its user profile and target its ads—does not establish that this specific line of code conveys a video title. At most, the allegations suggest Facebook could use the article title to build an audience, but that does not mean it understands that one line of code to be a specific video title. Absent non-conclusory facts linking the field to a video selection, Plaintiffs have not plausibly alleged a disclosure of protected information. This Court cannot make that inferential leap on their behalf.[4]

### D. Plaintiffs Do Not Allege Disclosure of Identifying Information

The Complaint never alleges any basic facts about any named Plaintiff's Facebook profile, such as whether it is public, whether it displays a real name, or whether it contains any identifying content, and Plaintiffs try to substitute the idea that "most people" use real information in their Facebook accounts to compensate for their deficient pleading. (Resp. at 16.) The cases Plaintiffs cite do not grapple with whether there was enough personally identifying information alleged to be in a Facebook profile. *Id.*

These defects are dispositive. Plaintiffs' attempt to transform the VPPA into a broad web-privacy statute fails under binding standards and the statute's text and purpose.

## CONCLUSION

Plaintiffs chose the wrong forum and the wrong theory. This Court lacks personal jurisdiction over DDM, and the Complaint does not state a claim under the VPPA, nor could any amendments cure its fundamental defects. The Court should dismiss the Complaint with prejudice.

---

[4] Plaintiffs note that other Circuits have different interpretations of what constitutes personally identifiable information (*e.g.*, Resp. at 14)—a tacit admission as to why Plaintiffs abandoned their case in another Circuit to file here. In any event, this Complaint does not meet the First Circuit's standard to state a claim under the VPPA.

Dated: October 24, 2025

Respectfully submitted,

DOTDASH MEREDITH, INC.

By its attorneys,

/s/ *Tony K. Lu*

Tony K. Lu (BBO# 678791)
DENTONS US LLP
101 Federal Street
Suite 1900
Boston, Massachusetts 02110
Tel: (617) 235-6817
tony.lu@dentons.com

Kristen C. Rodriguez (*admitted pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
kristen.rodriguez@dentons.com

Lyndsey M. Wajert (*admitted pro hac vice*)
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
lyndsey.wajert@dentons.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's CM/ECF system.

Respectfully submitted,

/s/ Tony K. Lu